1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

8

**UNITED STATES OF AMERICA,**

Plaintiff,

9

v.

10

**IMPULSE MEDIA GROUP, INC.,**

11

a Washington corporation,

12

Defendant.

13

**No. CV05-1285L**

**UNITED STATES' MOTION
and MEMORANDUM IN
SUPPORT OF SUMMARY
JUDGMENT**

NOTE ON MOTION CALENDAR:
(September 29, 2006)

14

15    **I.    Introduction**

16          Plaintiff United States of America ("United States") moves for summary judgment as to

17    liability under the Controlling the Assault of Non-Solicited Pornography and Marketing Act of

18    2003 ("CAN-SPAM" or "the Act"), 15 U.S.C. § 7701 <u>et</u> <u>seq.</u>, and the Federal Trade

19    Commission's Adult Labeling Rule (the "Adult Labeling Rule" or the "Rule"), 16 C.F.R. § 316,

20    against Defendant Impulse Media Group, Inc. ("IMG").  IMG violated the law by initiating the

21    transmission of hundreds of unsolicited commercial email messages ("spam") that contained

22    sexually explicit material and lacked the required warnings, disclosures, and opt-out

23    mechanisms.  As a result, unsuspecting recipients around the country were bombarded with

24    sexually explicit images in their in-boxes.  Congress explicitly forbade the transmission of the

25    email messages at issue in order to protect recipients of sexually explicit spam from viewing

26    material that they may find offensive and to provide recipients of commercial spam an

27

28

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

-1-

Dockets.Justia.com

opportunity to opt-out from receiving further messages from the sender.

There is no genuine dispute of the material facts that impose liability on IMG. IMG caused its "affiliates" to send the spam that is the subject of this motion. As discussed in Section VB, *infra*, IMG operated an affiliate program called "Soulcash." IMG provided its affiliates with marketing materials and support, paid affiliates for bringing subscribers to IMG as a part of its affiliate program, and induced affiliates to send email as a part of the Soulcash affiliate program. Further, the undisputed facts show that IMG affiliates promoted IMG's websites through unsolicited commercial email messages that contain sexually oriented material that violate

CAN-SPAM and the Adult Labeling Rule.

Congress recognized that there was often a distinction between firms that induce sexually explicit spam, like IMG, and entities that actually sent the spam, such as IMG's affiliates. The text, structure, and legislative history of the Act (*see* Sections IV and VI, *infra*) unequivocally demonstrate how Congress, motivated in large part by a desire to prevent pornographic email from being delivered to children, purposefully excluded a "knowledge" requirement from the pertinent provision of CAN-SPAM to expressly impose liability for injunctive relief on both those who induce the spam and the actual senders of spam. In doing so, Congress deliberately extended the scope of the statute to reach firms like IMG that induce and provide consideration to others to send sexually explicit email to non-consenting recipients. Thus, IMG is liable for injunctive relief.

Even where Congress did impose a knowledge requirement as with civil penalties (*see* Section VII, *infra*), the undisputed evidence in this case demonstrates that IMG had actual and implied knowledge of its affiliates' unlawful practices and of CAN-SPAM. Therefore, IMG is liable not just for injunctive relief, but for civil penalties as well. The contours of any injunction and the amount of any civil penalty will be decided in later proceedings.

Because there are no genuine issues of material fact in dispute as to whether IMG

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-1991

1 violated CAN-SPAM and the Rule, summary judgment in favor of the United States should be

2 granted.

3 **II.    Statement of Undisputed Facts**

4      **A.  IMG**

5      1.  Since January 1, 2004, and continuing to the present, Defendant IMG has owned and

6 operated dozens of commercial websites ("websites") that display a vast collection of sexually

7 oriented videos and pictures.  (IMG's Answer to the Amended Complaint at  ¶ 6, Incorporated

8 by Reference; Schermerhorn deposition, attached as Exhibit 9 at p. 8 lines 5-18 and p. 10 line 22

9 to p. 11 line 2).

10      2.  Seth Schermerhorn is the President and sole owner of IMG.  Seth Schermerhorn has

11 owned IMG since he started the company in 2001.  (Schermerhorn deposition, attached as

12 Exhibit 9 at p. 9 line 9 to p. 10 line 9 and p. 10 line 22 to p. 11 line 2).

13      3.  Seth Schermerhorn was identified by IMG as someone who designed the affiliate

14 program, negotiates and signs contracts, terminates and reinstates affiliates, deals with

15 complaints about affiliates, and monitors affiliates for compliance.   (Response No. 1 to

16 Interrogatory Requests, attached as Exhibit 4 at pp. 6-7).

17      4.  Adam Welch was employed by IMG from May 2003 to November 2005 as a project

18 manager.  While employed at IMG, Adam Welch worked on the day-to-day operations of the

19 company and served as an affiliate representative, providing assistance to affiliates.  (Welch

20 deposition, attached as Exhibit 7 at p. 8 line 17 to p. 10 line 12).

21      5.  Adam Welch was identified by IMG as someone who dealt with complaints about

22 affiliates and monitored affiliates for compliance.  (Response No. 1 to Interrogatory Requests,

23 attached as Exhibit 4 at pp. 6-7).

24      6.  During his employment at IMG, Adam Welch had direct contact with IMG affiliates.

25 (Schermerhorn deposition, attached as Exhibit 9 at p. 11 lines 21-24).

26      7.  Josh Mackey has been employed at IMG since 2002.  He has held the positions of

27

28 Plaintiff's Motion for                                              U.S. Department of Justice
   Summary Judgment                                          P.O. Box 386
   CV05-1285L                                                      Washington, DC  20044
                          -3-                                      (202) 353-1991

photographer and graphic designer.  Josh Mackey is responsible for creating and designing IMG's websites.  (Mackey deposition, attached as Exhibit 8 at p. 15 line 20 to p. 16 line 6 and p. 16 line 24 to p. 17 line 24).

8.  While employed at IMG, Josh Mackey has had direct contact with IMG affiliates. (Schermerhorn deposition, attached as Exhibit 9 at p. 11 lines 21-24).

**B. The IMG Affiliate Program**

9.  To fully access IMG's websites, individuals must subscribe and pay membership fees. (Schermerhorn deposition, attached as Exhibit 9 at p. 8 lines 13-18 and p. 26 lines 8-16).

10.  To attract members/subscribers to its websites, IMG runs an affiliate program called Soulcash.  Affiliates of the Soulcash program advertise IMG's websites.  Affiliates earn money each time they refer a customer who subscribes to one of IMG's adult websites.  (IMG's Answer to the Amended Complaint at  ¶ 6, Incorporated by Reference; Mackey deposition, attached as Exhibit 8 at p. 30 lines 23-25; Schermerhorn deposition, attached as Exhibit 9 at p. 8 line 19 to p. 9 line 3 and p. 21 lines 14-17).

11.  To become an affiliate of IMG, an applicant need only complete IMG's on-line affiliate application and provide an email address.  "There is no process employed [by IMG] to evaluate a prospective affiliate.  As long as the prospective affiliate agrees to the SOULCASH PROGRAM AGREEMENT and validates his email, he is entitled to participate."  (Response No. 2 to Interrogatory Requests, attached as Exhibit 4 at p. 8; Mackey deposition, attached as Exhibit 8 at p. 34 lines 5-18; Schermerhorn deposition, attached as Exhibit 9 at p. 14 line 23 to p. 15 line 9; Welch deposition, attached as Exhibit 7 at p. 32 line 11 to p. 33 line 25).

12.  IMG does not interview affiliate applicants as a part of the affiliate sign-up process. (Schermerhorn deposition, attached as Exhibit 9 at p. 15 lines 18-20).

13.  IMG does not ask affiliate applicants for references as a part of the affiliate sign-up process.  (Schermerhorn deposition, attached as Exhibit 9 at p. 15 lines 21-23).

14.  IMG approved an affiliate applicant who provided the following information during

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1   the sign-up process: first name "hjgjhgj;" last name "not provided;" street address "gjhgjghj

2   gjhgj;" city "ghjhgj;" state "ghjhgj;" country "ghjhgj;" email address "gjhgjhgj@Jjhgjhg.com."

3   IMG also approved affiliate applicants who provided the names "ccc xzc" and "sfdsfd dsfsdfsd."

4   (Excerpts from Response No. 4 to Document Requests - Affiliate Database, attached as Sealed

5   Exhibit 13).

6       15.  IMG assigns each affiliate a unique user identification ("user ID") consisting of

7   characters chosen by the affiliate during the affiliate sign-up process.  (IMG's Answer to the

8   Amended Complaint at ¶ 7, Incorporated by Reference; Response No. 6 to Interrogatory

9   Requests, attached as Exhibit 4 at pp. 11-12; Mackey deposition, attached as Exhibit 8 at p. 43

10  lines 2-8; Schermerhorn deposition, attached as Exhibit 9 at p. 22 lines 11-14).

11      16.  Some individuals have more than one affiliate account, with each account receiving

12  its own affiliate user ID.  (Schermerhorn deposition, attached as Exhibit 9 at p. 22 lines 3-10).

13      17.  IMG uses codes containing the affiliate's user ID to track subscriber sales and clicks

14  referred by affiliates and to determine which affiliates to pay for subscribers and sales brought to

15  IMG's websites.  (IMG's Answer to the Amended Complaint at ¶ 7, Incorporated by Reference;

16  Response No. 6 to Interrogatory Requests, attached as Exhibit 4 at pp. 11-12; Mackey

17  deposition, attached as Exhibit 8 at p. 42 line 17 to p. 43 line 1).

18      18.  IMG provides its affiliates with marketing and promotional tools — including

19  content, pictures, and video — to advertise IMG's websites.  Many of these items contain

20  sexually explicit material.  (Response No. 11 to Document Requests - Hosted Full Page Ads,

21  attached as Exhibit 16; Response No. 11 to Document Requests - Hosted Half Page Ads,

22  attached as Exhibit 17; Response No. 11 to Document Requests - Movies of the Day, attached as

23  Exhibit 18; Mackey deposition, attached as Exhibit 8 at p. 25 line 15 to p. 26 line 2 and p. 37

24  lines 15-24; Welch deposition, attached as Exhibit 7 at p. 34 line 19 to p. 36 line 15;

25  Schermerhorn deposition, attached as Exhibit 9 at p. 16 lines 4-12).

26      19.  Specifically, IMG provides the following to affiliates for marketing purposes: hosted

27

28  Plaintiff's Motion for                                   U.S. Department of Justice
    Summary Judgment                                         P.O. Box 386
    CV05-1285L                                               Washington, DC  20044
                                -5-                          (202) 353-1991

1  galleries, downloadable galleries, banners, pictures of the day, movies of the day, and

2  interstitials.  (Response No. 7 to Interrogatory Requests, attached as Exhibit 4 at p. 13).

3      20.  IMG provides these marketing and promotional tools to affiliates to "give the

4  affiliate a means to drive new . . . prospective website members to our sites."  (Schermerhorn

5  deposition, attached as Exhibit 9 at p. 17 lines 17-24).

6      21.  The marketing and promotional tools provided to affiliates generally have hyperlinks

7  embedded in the graphics to direct potential subscribers to IMG's websites.  (Mackey deposition,

8  attached as Exhibit 8 at p. 62 line 19 to p. 63 line 21).

9      22.  It is technically feasible for affiliates to use in emails many of the promotional tools

10  containing content, pictures, and videos provided by IMG to promote IMG's websites.  (Mackey

11  deposition, attached as Exhibit 8 at p. 37 line 25 to p. 38 line 7; Schermerhorn deposition,

12  attached as Exhibit 9 at p. 17 line 17 to p. 18 line 13 and p. 53 line 21 to p. 55 line 13; Welch

13  deposition, attached as Exhibit 7 at p. 36 lines 16-23 and p. 61 line 18 to p. 68 line 2).

14      23.  IMG provides detailed sales statistics to affiliates including number of sales, number

15  of clicks, referring URL information, and a list of the total dollar amount earned by the affiliate.

16  (IMG's Answer to the Amended Complaint at  ¶ 6, Incorporated by Reference; Response No. 6

17  to Interrogatory Requests, attached as Exhibit 4 at pp. 11-12; Mackey deposition, attached as

18  Exhibit 8 at p. 39 line 20 to p. 40 line 22; Schermerhorn deposition, attached as Exhibit 9 at p. 19

19  line 5 to p. 20 line 1).

20      24.  IMG provides support to affiliates through a support system that allows affiliates to

21  send questions to IMG and receive responses, "via toll and toll free telephone numbers posted in

22  the footer of every page," and through email communications and instant messenger.  (Response

23  No. 4 to Interrogatory Requests, attached as Exhibit 4 at p. 10; Schermerhorn deposition,

24  attached as Exhibit 9 at p. 16 line 21 to p. 17 line 16; Welch deposition, attached as Exhibit 7 at

25  p. 10 line 15 to p. 12 line 6).

26      25.  IMG sends a notification email to an affiliate each time the affiliate is credited with a

27

28  Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

subscription to an IMG website.  (Response No. 4 to Interrogatory Requests, attached as Exhibit 4 at p. 10; Sample Emails notifying affiliate of sale, attached as Exhibit 19).

### C.  Affiliate Payment Programs

26.  IMG has two payment plans for affiliates: "per sign-up" and "50/50 rev share."  Affiliates on the per sign-up payment plan are paid more per sale the more sales they refer to IMG's websites.  Affiliates on the rev share program earn 50 percent of the payments made by a subscriber.  (Schermerhorn deposition, attached as Exhibit 9 at p. 13 line 7 to p. 14 line 12; Welch deposition, attached as Exhibit 7 at p. 45 line 16 to p. 46 line 1).

27.  IMG runs bonus payouts to encourage affiliates to bring subscribers to IMG's websites.  IMG ran a bonus whereby affiliates who brought in ten or more sales received a bonus.  IMG ran a bonus payout called Fat Fridays that paid affiliates $50 per sign-up instead of the normal $25 or $30.  IMG also ran a gift certificate incentive program that gave affiliates who sent in ten or more sign-ups over a period of time a choice of a gift certificate from a number of stores.  (Schermerhorn deposition, attached as Exhibit 9 at p. 23 line 1 to p. 24 line 2; Welch deposition, attached as Exhibit 7 at p. 46 lines 8-14).

### D.  IMG Dealings With Its Affiliates; Spam Policies and Practice

28.  IMG maintains a computer database of affiliate information.  The affiliate database contains the information provided by affiliates during the sign-up process as well as the status of their account — active or terminated.  (Schermerhorn deposition, attached as Exhibit 9 at p. 44 line 25 to p. 45 line 22).

29.  IMG's response to Interrogatory Request No. 6 lists electronic mail and electronic newsletter marketing as examples of a type of marketing IMG affiliates may choose to use.  (Response No. 6 to Interrogatory Requests, attached as Exhibit 4 at p. 12).

30.  IMG's Program Agreement for Affiliates states that affiliates shall not use or employ any form of mass unsolicited electronic mailings.  In its Program Agreement for Affiliates, IMG reserves the right to terminate an affiliate for sending mass unsolicited electronic mail

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1  solicitations.  (IMG's Program Agreement for Affiliates, attached as Exhibit 5 at ¶ 2.3).

2      31.  IMG relies solely on the provision in its Program Agreement prohibiting spam by

3  affiliates to prevent affiliates from sending commercial email in violation of CAN-SPAM and

4  the Adult Labeling Rule.  (IMG's Program Agreement for Affiliates, attached as Exhibit 5 at ¶

5  2.3; Schermerhorn deposition, attached as Exhibit 9 at p. 30 lines 13-19).

6      32.  IMG received complaints from individuals who were the recipients of spam sent by

7  IMG affiliates.  (Schermerhorn deposition, attached as Exhibit 9 at p. 32 lines 5-18).

8      33.  IMG does not monitor or verify new affiliate sign-ups to determine if the applicant

9  has been previously terminated and ensure that a terminated affiliate does not sign-up again.  An

10  affiliate who had been terminated for spamming can "easily" sign-up again to the Soulcash

11  affiliate program by submitting different information during the affiliate sign-up process.

12  (Schermerhorn deposition, attached as Exhibit 9 at p. 63 lines 14-17; Welch deposition, attached

13  as Exhibit 7 at p. 59 line 8 to p. 60 line 20).

14      34.  In an effort to monitor its affiliates, it would have been feasible for IMG to:

15          a.  ask subscribers to IMG's websites, as part of the membership sign-up process,

16          how they learned of IMG.   (Mackey deposition, attached as Exhibit 8 at p. 47

17          line 15 to p. 48 line 2).

18          b.  ask affiliates what promotional means they use to advertise IMG's websites.

19          (Schermerhorn deposition, attached as Exhibit 9 at p. 18 line 22 to p. 19 line 1

20          and p. 24 lines 10-24; Welch deposition, attached as Exhibit 7 at p. 37 lines 19-

21          24).

22          c.  create a textlink on the first page of IMG's adult websites directing people who

23          arrived there unwillingly to a complaint form.  (Schermerhorn deposition,

24          attached as Exhibit 9 at p. 28 lines 3-23).

25      35.  IMG considered taking the following steps to monitor its affiliates:

26          a.  asking subscribers to IMG's websites, as part of the membership sign-up

27

28  Plaintiff's Motion for
   Summary Judgment
   CV05-1285L                                   U.S. Department of Justice
                                                P.O. Box 386
                                                Washington, DC  20044
                          -8-                   (202) 353-1991

1    process, how they learned of IMG.  (Schermerhorn deposition, attached as Exhibit

2    9 at p. 27 line 2 to p. 28 line 2).

3    b.  creating a textlink on the first page of IMG's adult websites directing people

4    who arrived there unwillingly to a complaint form.  (Schermerhorn deposition,

5    attached as Exhibit 9 at p. 28 lines 3-23).

6    36.  IMG did not undertake any of the monitoring methods identified in Paragraph 34.

7    a.  IMG did not ask subscribers to IMG's websites if they were directed to IMG's

8    websites through emails sent by affiliates.  (Mackey deposition, attached as

9    Exhibit 8 at p. 47 lines 5-14; Schermerhorn deposition, attached as Exhibit 9 at p.

10   18 lines 16-21; Welch deposition, attached as Exhibit 7 at p. 52 lines 6-10).

11   b.  IMG did not regularly ask affiliates what kinds of promotional tools they were

12   using to promote IMG's websites.  (Welch deposition, attached as Exhibit 7 at p.

13   36 line 24 to p. 37 line 5).

14   c.  IMG did not create a textlink on the first page of IMG's adult websites

15   directing people who arrived there unwillingly to a complaint form.

16   (Schermerhorn deposition, attached as Exhibit 9 at p. 28 lines 3-23).

17   37.  Other than the provisions in its Program Agreement for Affiliates, IMG takes no

18   affirmative steps to monitor affiliates for compliance with the CAN-SPAM Act and Adult

19   Labeling Rule.  Josh Mackey and Adam Welch were not aware of any steps IMG took to

20   monitor affiliates for compliance with the CAN-SPAM Act and Adult Labeling Rule.  Seth

21   Schermerhorn testified that IMG does occasional manual reviews of affiliate payout information

22   looking for suspicious transactions that are evidence of fraud or abuse.  No affiliate had ever

23   been terminated for violating CAN-SPAM or the Adult Labeling Rule as a result of one of these

24   reviews.  (Mackey deposition, attached as Exhibit 8 at p. 51 lines 20-23; Schermerhorn

25   deposition, attached as Exhibit 9 at p. 28 line 24 to p. 30 line 12 and p. 78 lines 7-14; Welch

26   deposition, attached as Exhibit 7 at p. 21 line 15 to p. 22 line 7).

27

28

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

38. IMG did not have existing affiliates review the CAN-SPAM Act when the law went into effect. (Schermerhorn deposition, attached as Exhibit 9 at p. 30 lines 23-25; Welch deposition, attached as Exhibit 7 at p. 53 line 23 to p. 54 line 9).

39. IMG did not provide training on the CAN-SPAM Act to its employees. (Schermerhorn deposition, attached as Exhibit 9 at p. 12 lines 8-10).

40. IMG did not set up a designated email account to receive spam complaints. (Schermerhorn deposition, attached as Exhibit 9 at p. 34 lines 22-24).

**E. Microsoft Trap Accounts**

41. As part of its continuing efforts to combat spam, Microsoft Corporation ("Microsoft") created and registered to itself a number of MSN Hotmail email accounts ("trap accounts"). The trap accounts are used to detect whether individuals or entities are sending spam to MSN Hotmail account users in violation of Microsoft's Terms of Use and Anti-Spam Policy. Microsoft did not consent to the receipt of email messages at the trap account addresses. (Bundy Declaration, attached as Exhibit 3 at p. 1; Vetter Declaration, attached as Exhibit 2 at p. 2).

42. In response to requests from the Federal Trade Commission, in or about November 2004, February 2005, and April 2006, Microsoft provided the government with hundreds of email messages sent by IMG affiliates to Microsoft's trap accounts. In addition to the original messages, Microsoft provided the government with copies of the messages created in Adobe PDF format. The Adobe PDF copies provide a snapshot of how the original email messages appeared and preserve the images in the event that the image sources in the original messages become inactive on the Internet. Microsoft also produced web captures created through HTTrack HTML. The web captures provide snapshots of where viewers would have been directed, e.g., what Internet websites they would have arrived at, had they clicked on the hyperlinked promotional material contained in the original messages. (Bundy Declaration, attached as Exhibit 3 at pp. 2-3; Vetter Declaration, attached as Exhibit 2 at p. 2).

**F. Violative Email Procured by IMG and Sent by IMG Affiliates**

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-1991

-10-

43. IMG affiliate "zillium" sent twenty-two unsolicited commercial email messages to Microsoft's trap accounts from September 8, 2004, to September 10, 2004. The email messages contain sexually explicit material and promote the IMG website gloryholestation.com. The messages bore hyperlinks that, when pressed, ultimately directed the viewer to a website owned by IMG. The email messages fail to contain the required label within the subject line or initially-viewable area of the messages; contain sexually-explicit material within the initially-viewable area of the messages; fail to include a valid physical postal address for IMG; and fail to include an opt-out mechanism. (Himelfarb Declaration at ¶¶ 9-12, attached as Exhibit 1).

44. IMG affiliate "zillium" sent five unsolicited commercial email messages to Microsoft's trap accounts on November 17, 2004. The email messages contain sexually explicit material and promote the IMG website gloryholestation.com. The messages bore hyperlinks that, when pressed, ultimately directed the viewer to a website owned by IMG. The email messages fail to contain the required label within the subject line or initially-viewable area of the messages; contain sexually-explicit material within the initially-viewable area of the messages; fail to include a valid physical postal address for IMG; and fail to include an opt-out mechanism. (Himelfarb Declaration at ¶¶ 36-38, attached as Exhibit 1).

45. IMG included "zillium" as a terminated affiliate on the list of terminated affiliates provided by IMG in Response to Document Request No. 7. (Terminated Webmasters - Response No. 7 to Document Requests, attached as Sealed Exhibit 12 at p. 107).

46. The affiliate accounts "zillium" and "ortika" are operated by the same person. Both accounts are registered to Renaud Philappart and both directed that payments be made to Renaud Philappart. (Excerpts from Response No. 4 to Document Requests - Affiliate Information, attached as Sealed Exhibit 13).

47. The IMG affiliate "ortika" is an active IMG affiliate account. (Terminated Webmasters - Response No. 7 to Document Requests, attached as Sealed Exhibit 12).

48. IMG affiliate "b32day" sent twelve unsolicited commercial email messages to

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1   Microsoft's trap accounts from July 6, 2004, to July 18, 2004.  The email messages contain

2   sexually explicit material and promote the IMG websites blacksdowhites.com,

3   gloryholestation.com, jizzlickers.com, and melodyhart.com.  The messages bore hyperlinks that,

4   when pressed, ultimately directed the viewer to a website owned by IMG.  The email messages

5   fail to contain the required label within the subject line or initially-viewable area of the

6   messages; contain sexually-explicit material within the initially-viewable area of the messages;

7   and fail to include a valid physical postal address for IMG.  In addition, the messages contain an

8   opt-out mechanism that appears *after* the sexually-explicit material rather than within the

9   initially-viewable area.   (Himelfarb Declaration at ¶¶ 13-19, attached as Exhibit 1).

10          49.  IMG paid the affiliate "b32day" $1,634.97 from January 2004 to December 2005.

11   (Excerpts from Webmaster Earnings Document - Response No. 14 to Document Requests,

12   attached as Sealed Exhibit 11).

13          50.  The affiliate accounts "b32day" and "a313372" are operated by the same person.

14   These two accounts were registered under the same name, phone number, physical address, and

15   email address.  Affiliate accounts "b32day" and "a313372" both directed that their payments be

16   made in the same name of 634099 BC Ltd.  (Excerpts from Response No. 4 to Document

17   Requests - Affiliate Information, attached as Sealed Exhibit 13).

18          51.  IMG paid the affiliate account "a313372" $4,201.47 from January 2004 to December

19   2005.  (Excerpts from Webmaster Earnings Document - Response No. 14 to Document Requests,

20   attached as Sealed Exhibit 11).

21          52.  The IMG affiliate "b32day" is an active IMG affiliate account.  (Terminated

22   Webmasters - Response No. 7 to Document Requests, attached as Sealed Exhibit 12).

23          53.  IMG affiliate "scorpion" sent 355 unsolicited commercial email messages to

24   Microsoft's trap accounts from May 28, 2004, to August 2, 2004.  The email messages contain

25   sexually explicit material and promote the IMG websites funtit.com, gloryholestation.com,

26   jizzlickers.com, and tastytranny.com.  The messages bore hyperlinks that, when pressed,

27

28   Plaintiff's Motion for                              U.S. Department of Justice
     Summary Judgment                                    P.O. Box 386
     CV05-1285L                                          Washington, DC  20044
                                    -12-                 (202) 353-1991

1  ultimately directed the viewer to a website owned by IMG.  The email messages fail to contain

2  the required label within the subject line or initially-viewable area of the messages; contain

3  sexually-explicit material within the initially-viewable area of the messages; and fail to include a

4  valid physical postal address for IMG.  In addition, the messages contain an opt-out mechanism

5  that appears *after* the sexually-explicit material rather than within the initially-viewable area.

6  (Himelfarb Declaration at ¶¶ 20-32, attached as Exhibit 1).

7      54.  IMG paid the affiliate "scorpion" $2,057.00.  (List of Affiliate Payment Information,

8  attached as Exhibit 10).

9      55.  The affiliate accounts "scorpion," "teddybear," and "dacash" are operated by the

10  same entity or person.  These three accounts were registered under the same name, phone

11  number, physical address, and email address.  Affiliates "scorpion," "teddybear," and "dacash"

12  directed that their payments be made in the same name of Maps Holding, Inc.  (Excerpts from

13  Response No. 4 to Document Requests - Affiliate Information, attached as Sealed Exhibit 13).

14      56.  IMG paid "dacash" $8,121.27.  (List of Affiliate Payment Information, attached as

15  Exhibit 10).

16      57.  IMG affiliate "teddybear" sent fourteen unsolicited commercial email messages to

17  Microsoft's trap accounts on July 15, 2004.  The email messages contain sexually explicit

18  material and promote the IMG website bootycakes.com.  The messages bore hyperlinks that,

19  when pressed, ultimately directed the viewer to a website owned by IMG.  The email messages

20  fail to contain the required label within the subject line or initially-viewable area of the

21  messages; contain sexually-explicit material within the initially-viewable area of the messages;

22  and fail to include a valid physical postal address for IMG.  In addition, the messages contain an

23  opt-out mechanism that appears *after* the sexually-explicit material rather than within the

24  initially-viewable area.  (Himelfarb Declaration at ¶¶ 33-35, attached as Exhibit 1).

25      58.  IMG paid "teddybear" $2,367.16.  (List of Affiliate Payment Information, attached

26  as Exhibit 10).

27

28  
Plaintiff's Motion for
Summary Judgment
CV05-1285L

-13-

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

59. IMG affiliate "imatrix" sent five unsolicited commercial email messages to Microsoft's trap accounts on August 7, 2004. The email messages contain sexually explicit material and promote the IMG website jizzlickers.com. The messages bore hyperlinks that, when pressed, ultimately directed the viewer to a website owned by IMG. The email messages fail to contain the required label within the subject line or initially-viewable area of the messages; contain sexually-explicit material within the initially-viewable area of the messages; and fail to include a valid physical postal address for IMG. In addition, the messages contain an opt-out mechanism that appears *after* the sexually-explicit material rather than within the initially-viewable area. (Himelfarb Declaration at ¶¶ 39-41, attached as Exhibit 1).

60. The IMG affiliate "imatrix" is an active IMG affiliate account. (Terminated Webmasters - Response No. 7 to Document Requests, attached as Sealed Exhibit 12).

61. The email messages described in Paragraphs 43 through 59 were unsolicited. IMG produced one document in response to the United States' First Request for Production of Documents No. 16 for "documents that demonstrate affirmative consent by a person to receive commercial electronic mail message containing sexually oriented material." The only document IMG produced in response to Document Request No. 16 was IMG's Terms and Conditions of Subscription, a document that outlines terms and conditions for IMG's subscribers and does not show any evidence of affirmative consent by any person. (Affiliate Terms and Conditions of Subscription - Response No. 16 to Document Requests, attached as Exhibit 20).

62. In addition, Microsoft never consented to the receipt of any email to its trap accounts. (Vetter Declaration, attached as Exhibit 2 at p. 2).

63. The email messages described in Paragraphs 43 through 59 contain sexually explicit material, as is evident from the face of the messages.

64. IMG affiliates zillium, b32day, scorpion, teddybear, and imatrix sent 413 sexually explicit email messages promoting websites owned by IMG. (Himelfarb Declaration at ¶42,

Plaintiff's Motion for
Summary Judgment
CV05-1285L

-14-

U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-1991

1  attached as Exhibit 1).

2  **III.    Summary Judgment Standard**

3         Summary judgment is warranted if there is no genuine issue as to any material fact and

4  the moving party is entitled to a judgment as a matter of law.  <u>Baccarat Fremont Developers v.</u>

5  <u>U.S. Army Corps of Eng'rs</u>, 425 F.3d 1150, 1158 (9th Cir. 2005).  Summary judgment is

6  appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

7  together with the affidavits, if any, show that there is no genuine issue as to any material fact and

8  that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

9         The moving party has the initial burden of establishing that no genuine issue of material

10 fact exists.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).  This burden may be satisfied

11 by any kind of admissible evidence.  <u>Id.</u> at 324.  Once the moving party demonstrates that there

12 are no genuine issues of material fact warranting trial, the non-moving party is required to

13 produce evidence in opposition to the motion.  <u>Id.</u> at 324.  The opposing party must come

14 forward with "specific facts" showing that there is a genuine issue for trial.  <u>Matsushita Elec.</u>

15 <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  It is not enough for the non-

16 movant to offer merely colorable evidence that a genuine issue of material fact exists for trial.

17 <u>FTC v. Gill</u>, 265 F.3d 944, 954 (9th Cir. 2001).

18        Because there is no genuine issue of material fact as to whether Defendant IMG initiated

19 hundreds of unsolicited commercial email messages that contain sexually oriented material and

20 violated CAN-SPAM and the Rule, the Court should enter summary judgment against IMG as to

21 liability for those violations.  Determining appropriate relief, including the amount of civil

22 penalty, is an issue to be determined by further proceedings.

23 **IV.    Background on CAN-SPAM and the Adult Labeling Rule**

24        Congress enacted CAN-SPAM and directed the Federal Trade Commission ("FTC") to

25 promulgate what became the Adult Labeling Rule in part to protect people from being exposed

26 to sexually explicit material without taking some affirmative step to see the material.  <u>See</u>

27

28

1    15 U.S.C. § 7701(a)(5); see also, Federal Trade Commission, *Statement of Basis and Purpose,*

2    *Label for Email Messages Containing Sexually Oriented Material*, 16 C.F.R. Part 316 (April 19,

3    2004) (Introduction).  By dictating that certain warnings and opt-out mechanisms must appear in

4    the initially viewable area of the message, and commanding that sexually oriented material[1]

5    cannot appear in the initially viewable area, the Act and Rule protect recipients from

6    unintentionally viewing material that may be classified as vulgar or pornographic.  See Federal

7    Trade Commission, *Statement of Basis and Purpose, Label for Email Messages Containing*

8    *Sexually Oriented Material*, 16 C.F.R. Part 316 (April 19, 2004) (Introduction).

9         The Act and Rule are intended to protect minor recipients from unwillingly viewing

10   inappropriate material.  Congressional intent in this regard could not be clearer.  As Senator

11   McCain stated: "There are other costs to our society besides monetary costs.  All of us are deeply

12   concerned about the risks to our children who use e-mail and may be victimized by the nearly

13   20 percent of spam that contains pornographic material, including graphic sexual images."

14   149 Cong. Rec. S13012, 13020 (daily ed. Oct. 22, 2003).  Congressman Upton was similarly

15   concerned:  "As the father of two young kids, I am particularly pleased that this bill requires

16   warning labels on commercial e-mails which contain sexually oriented material, and it protects

17   our kids from being unwittingly exposed to such garbage that might pop up in the family's

18   inbox."  149 Cong. Rec. H12186, 12194 (daily ed. Nov. 21, 2003).  See also S. Rep. No.

19   108-102, at 4 (2003) (noting that "[u]nsuspecting children who simply open e-mails with

20   seemingly benign subject lines may be either affronted with pornographic images in the e-mail

21   message itself, or automatically and instantly taken-without requiring any further action on their

22   part (like clicking on a link)-to an adult web page exhibiting sexually explicit images");

23   _____

24        [1]  The Act and the Rule prohibit "sexually oriented material" from an email message's initially
     viewable area.  "Sexually oriented material" encompasses "actual or simulated – (i) sexual intercourse,
25   including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or
     opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious
26   exhibition of the genitals or pubic area of any person[.]"  15 U.S.C. § 7704(d)(4); 18 U.S.C.
     § 2256(2)(A).
27

28   Plaintiff's Motion for                                    U.S. Department of Justice
     Summary Judgment                                         P.O. Box 386
     CV05-1285L                                               Washington, DC  20044
                                    -16-                      (202) 353-1991

1    149 Cong. Rec. H12186, 12194 (daily ed. Nov. 21, 2003) (statement of Congressman Dingell)

2    ("I am particularly pleased that the bill permits law enforcement to go after those who disguise

3    sexual messages and through such deception are able to send sexual material into our homes and

4    into the hands of our children.  This is a critical first step against those who profit by sending

5    unwanted and offensive sexual commercial messages.  It will stop much wrongdoing.").

6        Under the Act and the Rule, any person who initiates the transmission to a "protected

7    computer"[2] of any commercial email message[3] that includes sexually oriented material must

8    include the phrase "SEXUALLY-EXPLICIT: " at the beginning of the subject line in the header

9    of the message.  15 U.S.C. § 7704(d)(1)(A); 16 C.F.R. § 316.4(a)(1).  CAN-SPAM and the Adult

10   Labeling Rule also require that any commercial email message that includes sexually oriented

11   material place only the following information within the content of the message that is initially

12   viewable by the recipient, when the message is opened by the recipient and absent any further

13   action by the recipient ("initially viewable content"):

14       (A)  the phrase "SEXUALLY-EXPLICIT: " in a clear and conspicuous manner,

15   15 U.S.C. § 7704(d)(1)(B)(i); 16 C.F.R. § 316.4(a)(2)(i);

16       (B)  clear and conspicuous identification that the message is an advertisement or

17   solicitation, 15 U.S.C. § 7704(d)(1)(B)(ii); 16 C.F.R. § 316.4(a)(2)(ii);

18       (C)  clear and conspicuous notice of the opportunity of a recipient to decline to receive

19   further commercial email messages from the sender, 15 U.S.C. § 7704(d)(1)(B)(ii); 16 C.F.R.

20   § 316.4(a)(2)(iii);

21       (D)  a functioning return email address or other Internet-based mechanism, clearly and

22

23   _____

24       [2]  "Protected computer" includes all computers used in interstate commerce or communications.
     See 15 U.S.C. § 7702(13), referencing 18 U.S.C. § 1030(e)(2)(B).  The definition is broad, encompassing
25   almost all computers that utilize email or browse the web.

26       [3]  "Commercial electronic email message" includes any message that primarily promotes a
     "commercial product or service (including content on an Internet website operated for a commercial
27   purpose."  15 U.S.C. § 7702(2)(A).

28   Plaintiff's Motion for                    U.S. Department of Justice
     Summary Judgment                         P.O. Box 386
     CV05-1285L                               Washington, DC  20044
                            -17-              (202) 353-1991

conspiciously displayed, that a recipient may use to submit a reply email message or other form of Internet-based communication requesting not to receive future commercial email messages from that sender at the email address where the message was received, and that remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message, 16 C.F.R. § 316.4(a)(2)(iv);

(E)  clear and conspicuous display of a valid physical postal address of the sender,[4] 15 U.S.C. § 7704(d)(1)(B)(ii); 16 C.F.R. § 316.4(a)(2)(v); and

(F)  any needed instructions on how to access, or activate a mechanism to access, the sexually oriented material, 15 U.S.C. § 7704(d)(1)(B)(iii); 16 C.F.R. § 316.4(a)(2)(vi).

Under CAN-SPAM itself, it is also unlawful for any person to initiate commercial electronic mail to a protected computer unless the message provides clear and conspicuous notice of an opt-out provision and bears a valid physical postal address of the sender.  15 U.S.C. § 7704 (a)(3), (a)(5)(A)(ii)-(iii).  These provisions apply whether or not the email contains sexual material.

IMG is liable for the hundreds of email messages that its affiliates sent that violate these provisions of the law.[5]  Liability under CAN-SPAM is assessed for "initiating" email messages

---

[4]  The term sender is defined as "a person who initiates such a message."  15 U.S.C. § 7702(16).  IMG is a sender, and thus IMG's physical postal address is required, because IMG initiated the commercial electronic messages at issue.

[5]  The three counts of the Complaint reflect these CAN-SPAM and Rule requirements.   Count I alleges that on numerous instances IMG initiated the transmission to protected computers of commercial email with sexually oriented material that did not include the required "SEXUALLY-EXPLICIT: " label at the beginning of the subject line.  Count I also alleges that these messages were unlawful in that sexually explicit material appeared in the initially viewable area, and the following required information was absent:  another recitation of  "SEXUALLY-EXPLICIT: "; a notice of the right to opt-out of receiving further email; and a clear and conspicuous display of a valid physical postal address of the Defendant.  These are alleged to violate 15 U.S.C. § 7704(d) and 16 C.F.R. § 316.4(a).

Counts II and III of the Complaint involve the same email messages, and allege violations of CAN-SPAM provisions that apply to all commercial electronic mail, whether or not it contains sexually oriented material.  Count II alleges that the emails failed to include clear and conspicuous notice of the opportunity to decline to receive further commercial email messages, violating 15 U.S.C. § 7704(a)(5)(A)(ii) and (a)(3).  Count III alleges that the emails failed to include Defendant's valid

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

that violate the statute.  See 15 U.S.C. § 7704(a)(1) ("It is unlawful for any person to initiate the

transmission, to a protected computer, of a commercial electronic message . . . ."); 15 U.S.C.

§ 7704(a)(5)(A) (same).  Under CAN-SPAM:

> The term "initiate" when used with respect to a commercial electronic mail message, means to originate or transmit such message or *to procure the origination or transmission of such message*, but shall not include actions that constitute routine conveyance of such message.  For purposes of this paragraph, *more than one person may be considered to have initiated a message*.

15 U.S.C. § 7702(9) (emphasis added).[6]  CAN-SPAM defines "procure" as follows:

> The term "procure" when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf.

15 U.S.C. § 7702(12).  "Initiate" means to originate or procure the origination of such message,

and the definition of "initiate" specifically provides that "more than one person may be

considered to have initiated a message."  15 U.S.C. § 7702(9).   In drafting this language,

Congress envisioned that one person could push the button and others provide consideration or

induce the "button pusher" to push the button — and all violate the law.  A colloquy between

Senators Burns and Wyden confirms that Congress intended that multiple parties (*e.g.*,

merchants and spammers) may both be liable under CAN-SPAM for the same email.  In

response to Senator Burns' question "Can't the FTC, State A.G.s, and Internet Service Providers

bring actions under Section 5[7] against parties who aren't themselves spamming, but rather hire

spammers to promote their products and services," Senator Wyden responds: "Absolutely.  The

bill's definition of 'initiate' makes that clear, because it applies not only to the spammer that

---

physical postal address, violating 15 U.S.C. § 7704(a)(5)(A)(iii).

[6] "Routine Conveyance" means the "transmission, routing, relaying, handling, or storing, through an automatic technical process, of an electronic mail message for which another person has identified the recipients or provided the recipient addresses."  15 U.S.C. § 7702(15).  The definition encompasses, e.g., the routers, and Internet Service Providers that handle email message traffic.

[7] The Government's Complaint asserts claims under Section 5 of the CAN-SPAM Act. 15 U.S.C. § 7704.

*Plaintiff's Motion for*
*Summary Judgment*
*CV05-1285L*

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

-19-

1  originates the actual email, but also to a party who has hired or otherwise induced the spammer

2  to send the e-mail on its behalf.  If the e-mail message violates the bill, both parties would be on

3  the hook under Section 5, and enforcement would be possible against both or either parties."

4  149 Cong. Rec. S 15938, 15945.  Thus, CAN-SPAM holds the button pusher liable, as well as

5  those who procure or induce the illegal email messages.  That is, CAN-SPAM imposes liability

6  on all parties who initiate violative email messages.  IMG meets the definition of a statutory

7  initiator because IMG procured the transmission of the violative messages at issue.  CAN-

8  SPAM's legislative history, discussed *infra* Section VI, demonstrates further that CAN-SPAM

9  was designed to impose liability on entities like IMG in cases as this.

10  **V.    IMG Violated CAN-SPAM and the Adult Labeling Rule**

11         The evidence demonstrates that IMG initiated the transmission of hundreds of unsolicited

12  commercial email messages that violated CAN-SPAM and the Adult Labeling Rule.  Therefore,

13  IMG should be found liable for violating the law.[8]  IMG reached consumers through an affiliate

14  program called "Soulcash."  As discussed below, IMG paid affiliates for bringing paying

15  subscribers to IMG's websites and virtually anyone could sign up as an IMG affiliate and

16  advertise IMG's websites.  The affiliates were the spammers who sent the violative email, but

17  IMG is responsible because it initiated the email.

18         IMG readily acknowledges that it operated the Soulcash affiliate program.  The operation

19  of Soulcash is detailed in the Statement of Facts.  (SOF 10-17)  There is similarly no dispute that

20  email promoting IMG's websites was delivered to various recipients.  The Government received

21  these emails from Microsoft.[9]  The messages were delivered to email accounts, called "trap

22  _____

23         [8]  The effective date of CAN-SPAM was January 1, 2004, and the effective date of the Adult
    Labeling Rule was May 19, 2004.  The violative emails initiated by IMG after January 1, 2004, and
24  before May 19, 2004, only violate the CAN-SPAM Act as the Rule was not effective when these emails
    were initiated.  References in the Memorandum to email violating both the Act and the Rule refer to those
25  email messages sent on or after May 19, 2004.

26         [9]  Allyson Himelfarb, an Investigator with the FTC, reviewed the emails obtained through the
27  Microsoft trap accounts.  Her declaration, attached as Exhibit 1, details the facts as to how these emails

28  Plaintiff's Motion for                                              U.S. Department of Justice
    Summary Judgment                                          P.O. Box 386
    CV05-1285L                                                     Washington, DC  20044
                                    -20-                            (202) 353-1991

accounts," maintained by Microsoft to monitor spam activity over the Internet.  (SOF 41-42)

Email that was delivered to the Microsoft trap accounts promoting IMG websites is associated

with various Soulcash affiliates.  (SOF 43-59)  The Government does not anticipate that

Defendant will seriously dispute any of this.  Rather, the Government believes that IMG will

dispute its legal liability for violative email associated with (or sent by) Soulcash affiliates.

### A. The Email Messages Promoting IMG's Websites Violate CAN-SPAM and the Rule

IMG affiliates promoted IMG's websites through unsolicited commercial email messages

that contained sexually oriented material.  The hundreds of email messages at issue were clearly

"unsolicited" because they were delivered to the Microsoft trap accounts, which were dummy

accounts set up just to determine what spam would be delivered to them.  These accounts

received violative email simply because they existed.  Microsoft never provided consent to

anyone to send email to any of the trap accounts.  (SOF 41, 62)  The United States sought from

IMG any evidence it had regarding affirmative consent to "receive commercial electronic mail

message[s] containing sexually oriented material," and IMG produced no responsive documents

showing evidence of affirmative consent.  (SOF 61)

The emails at issue are "commercial" because their purpose was to induce people to

subscribe to IMG's adult oriented pay-websites.  As is evident from the face of the email

messages, the messages also contain sexually oriented material as defined by 18 U.S.C.

§ 2256(2)(A).  Examples of unsolicited commercial email messages sent by IMG affiliates that

contain sexually explicit material are at Exhibit 14.  The messages contain hyperlinks that when

"pressed" direct the viewer to the underlying IMG websites being advertised.

violate CAN-SPAM and the Rule and explains how these emails are associated with specific IMG
affiliates. Exhibit 15 contains the universe of email messages that the United States contends violate
CAN-SPAM and the Adult Labeling Rule.  Exhibit 14 contains the specific email messages discussed in
Ms. Himelfarb's declaration that are a representative sample of the universe of messages.  Ms.
Himelfarb's declaration refers to the emails in Exhibit 14 as copies of printouts with specific attachment
numbers.  The specific email messages from Exhibit 14 discussed in Ms. Himelfarb's declaration are also
attached as hard copies to the courtesy copy of exhibits provided to chambers.

Plaintiff's Motion for
Summary Judgment
CV05-1285L

-21-

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1

2      The unsolicited commercial email messages promoting IMG violated CAN-SPAM and

3   the Rule.  All of the hundreds of email messages at issue contain sexually explicit material in the

4   initially viewable content of the messages, in violation of the Act, 15 U.S.C. § 7704(d), and the

5   Adult Labeling Rule, 16 C.F.R. § 316.  In addition, all of the messages fail to include the

6   required label in the subject line of the message and initially-viewable area of the message; and

7   fail to include an opt-out mechanism or valid physical postal address of the sender within the

8   initially viewable area.  15 U.S.C. § 7704(a)(3), (a)(5)(A)(ii)-(iii); 15 U.S.C. § 7704(d);

9   16 C.F.R. § 316.  The sample email messages discussed in Ms. Himelfarb's declaration, which
10   are exhibits to that declaration, illustrate these violations.

**B.  IMG Induced Affiliates to Send Violative Messages**
11
      While many of the affiliates who sent violative emails received payment for the sales
12   they referred to IMG, the CAN-SPAM Act does not require an affiliate to be paid for sending
13   violative emails in order for a violation to occur.  A company could be liable as an initiator of
14   violative emails without ever paying an affiliate for its services.  This is because the Act imposes
15   liability on a company that procures the initiation or transmission of a message, and a company
16   can procure the initiation of a violative email by paying an affiliate or by inducing an affiliate to
17   send violative email.  Inducement is sufficient because it is the procuring of the initiation of the
18   email that creates the forbidden result, i.e., the sending of the violative email.  After-the-fact
19   payment to the affiliate by a company is a telling – but not *necessary* component of liability.
20
      IMG provided affiliates with marketing and promotional materials that could be used in
21   emails to promote IMG's websites.  (SOF 18-19)  Specifically, IMG provides the following to
22   affiliates for marketing purposes: hosted galleries, downloadable galleries, banners, pictures of
23   the day, movies of the day, and interstitials.  (SOF 19)  IMG provides these marketing and
24   promotional tools to affiliates to "give the affiliate a means to drive new . . . prospective website
25   members to our sites."  (SOF 20)
26
      As part of the affiliate program, IMG provides assistance to affiliates through a support
27

28   Plaintiff's Motion for                                      U.S. Department of Justice
     Summary Judgment                                           P.O. Box 386
     CV05-1285L                                                 Washington, DC  20044
                                        -22-                    (202) 353-1991

1   system that allows affiliates to send questions to IMG and receive responses, "via toll and toll

2   free telephone numbers posted in the footer of every page," and through email communications

3   and instant messenger. (SOF 24) IMG also provides detailed sales statistics to affiliates

4   including number of sales, number of clicks, referring URL information, and a list of the total

5   dollar amount earned by the affiliate. (SOF 23) IMG even sends a notification email to an

6   affiliate each time the affiliate is credited with a subscription to an IMG website. (SOF 25)

7           IMG induced affiliates to send violative emails through promises of payment. Affiliates

8   earn money each time they refer a customer who subscribes to one of IMG's adult websites.

9   (SOF 10) IMG has two payment plans for affiliates, "per sign-up" and "revenue share."

10  Affiliates on the per sign-up payment plan are paid more per sale, with payments increasing with

11  the number of sales they refer to IMG's websites. Affiliates on the revenue share program

12  receive fifty percent of the gross receipts from the accounts they refer. (SOF 26)

13          To induce affiliates to bring subscribers to IMG's websites, IMG ran bonus payouts.

14  (SOF 27) IMG ran a bonus payout called Fat Fridays that paid affiliates $50 per sign-up instead

15  of the normal $25 or $30. (SOF 27) IMG ran a gift certificate incentive program that gave

16  affiliates who sent in ten or more sign-ups over a period of time a choice of a gift certificate from

17  a number of stores. (SOF 27)

18          Several of the affiliates who sent the violative emails at issue were paid for successfully

19  recruiting subscribers to IMG's adult websites. According to records produced by IMG, IMG

20  paid affiliate "b32day" $1,634.97 (SOF 49); affiliate "scorpion" $2,057.00 (SOF 55); affiliate

21  "teddybear" $2,367.16 (SOF 58); affiliate "dacash" $8,121.27 (SOF 56); and affiliate "a313372"

22  $4,201.47 (SOF 51).[10]

23  _____

24          [10]  The government's evidence does not include emails sent directly by the affiliates "dacash"
    and "a313372." However, these two accounts,"dacash" and "a313372," are operated by individuals that
25  did send some of the violative emails. (Ex. 15) The affiliate accounts "b32day" and "a313372" were
    registered under the same name, phone number, physical address, and email address and both affiliates
26  directed that their payments be made in the name of 634099 BC Ltd. (SOF 50) The affiliate accounts
    "scorpion," "teddybear," and "dacash" were registered under the same name, phone number, physical

28  Plaintiff's Motion for                                              U.S. Department of Justice
    Summary Judgment                                                    P.O. Box 386
    CV05-1285L                                                          Washington, DC  20044
                                          -23-                          (202) 353-1991

1    IMG induced affiliates by promising to pay them for bringing sales to IMG's websites

2    and providing all the tools and support necessary for the affiliates to make those sales happen.

3    Thus, IMG procured the transmission of the violative emails, including the hundreds of emails

4    that came to the government's attention.  As such, IMG initiated the unlawful email messages

5    and violated CAN-SPAM and the Rule.

6    **VI.    CAN-SPAM's Legislative History Underscores IMG's Liability**

7    IMG is liable for the unlawful transmission of spam because it intentionally provided

8    consideration to and induced others to initiate violative email messages on IMG's behalf.  What

9    is required under this standard is that IMG did not act accidentally in inducing violative email.

10   The Act does not require any showing of specific intent or knowledge for liability to attach.

11   Rather, IMG's procurement of violative email makes IMG liable for injunctive relief for

12   violating the Act.

13   The legislative history of CAN-SPAM demonstrates that Congress intended for procurers

14   of commercial email such as IMG to be held liable in FTC actions as this.  That is, Congress

15   targeted entities such as IMG for liability for injunctive relief premised on CAN-SPAM

16   violations associated with those induced to send commercial email, whether or not the "inducer"

17   (here, IMG) had knowledge of the violative email.  Indeed, Congress intentionally rejected a

18   knowledge standard in the definition of "procure" as it applies in FTC enforcement actions.  In

19   the July 16, 2003, Senate version of the bill (S. 877), the definition of "procure" was as follows:

20   The term "procure," when used with respect to the initiation of a commercial
     electronic mail message, means intentionally to pay or provide other
21   consideration to, or induce, another person to initiate such a message on one's
     behalf, knowing, or consciously avoiding knowing, the extent to which that
22   person intends to comply with the requirements of this Act.

23   S. 877 Sec. 3(13) (July 16, 2003).  However, the version of the bill that became law does not

24   include this knowledge requirement in the definition of "procure."  See 15 U.S.C. § 7702(12).

25

26   address, and email address and these three affiliates directed that their payments be made in the name of
27   Maps Holding Inc.  (SOF 55)

28   Plaintiff's Motion for                          U.S. Department of Justice
     Summary Judgment                                P.O. Box 386
     CV05-1285L                                      Washington, DC  20044
                          -24-                       (202) 353-1991

Thus, Congress considered inserting a "knowledge" element in this violation, but decided not to do so.

The legislative history further underscores Congressional intent by elaborating on the very meaning of "knowledge" that was deleted from this definition. A Senate Report discusses the definition of "procure" that included the knowledge requirement that was later jettisoned. The Report discusses the possibility of renegade behavior by a third party hired by a company to send spam. The Senate Committee report states:

> The intent of this definition is to make a company responsible for e-mail messages that it hires a third party to send, unless that third party engages in renegade behavior that the hiring company did not know about. However, the hiring company cannot avoid responsibility by purposefully remaining ignorant of the third party's practices. The "consciously avoids knowing" portion of this definition is meant to impose a responsibility on a company hiring an e-mail marketer to inquire and confirm that the marketer intends to comply with the requirements of this Act.

S. Rep. No. 108-102, at 15 (2003). When Congress struck the knowledge requirement from the final law as it applies to FTC enforcement actions, all of this analysis was rejected. A company that induces a third party to send commercial email is liable for that third party's violations regardless of whether the company knows or has reason to know of any possible CAN-SPAM violations. There is no exception for renegade behavior.

Thus, Congress enacted a legislative scheme which gave broad discretion to the FTC to bring enforcement actions against those who caused CAN-SPAM violations to occur. Congress deleted any "renegade affiliate" defense that IMG might proffer. Even in those parts of the statute where Congress did impose a knowledge element for a violation,[11] Congress specifically deleted these knowledge elements when the FTC was seeking cease-and-desist orders and injunctive relief. 15 U.S.C. § 7706(e). Congressional intent to impose liability in FTC enforcement actions against those who induce CAN-SPAM violations, regardless of their "knowledge" of the violations, could hardly be clearer.

---

[11] See § 7704(a)(1)(C), (a)(2), (a)(4)(A) clause (ii), (iii), and (iv); § 7704(b)(1)(A), (b)(3).

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

-25-

1    Congress further demonstrated its intent for a strict liability scheme for procurers of spam

2    under Section 5 when it added the knowledge element into the provision authorizing private

3    causes of action brought by Internet Service Providers ("ISPs"). The "special definition of

4    'procure'," applicable in cases brought by ISPs, includes the words, "with actual knowledge, or

5    by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern

6    or practice that violates this [Act]." 15 U.S.C. § 7706(g)(2). Congress did not include this

7    language in the definition of procure for FTC enforcement actions under Section 5 and,

8    therefore, Congress intended that such procurers would be liable regardless of any knowledge of

9    their spammers' conduct.

10    The stark contrast between the relevant criminal and civil provisions of the law further

11    emphasize that the latter has no knowledge requirement. The criminal provision is 15 U.S.C.

12    § 7704(d)(5). Section 7704(d)(1) creates the requirement to place warning labels on commercial

13    electronic mail containing sexually oriented material such as the spam involved in this case.

14    Section (d)(5) makes it a five-year felony to "knowingly" violate this provision. 15 U.S.C.

15    § 7704(d)(5). If the civil violation of CAN-SPAM already included a knowledge element, then

16    adding a "knowingly" requirement to the criminal provision would be mere surplusage and there

17    would be no distinction between the mental elements of civil and felony violations, at least in

18    circumstances involving "procuring" violative spam. Congress did not create such a nullity

19    when it defined the criminal offense.

20    Reviewing the statutory scheme as a cohesive whole shows that whereas a criminal case

21    requires actual knowledge and a suit brought by an ISP requires consciously avoiding

22    knowledge, the present civil case requires something less to obtain injunctive relief. What is

23    required, and what is undisputed in this case, is that IMG did not act accidentally in inducing the

24    violative email. IMG's Soulcash affiliate program was created quite deliberately.

25    **VII.    IMG is Liable for Civil Penalties**

26    Pursuant to Section 7(a) of CAN-SPAM, the Act "shall be enforced by the [FTC] as if the

27

28    Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1  violation of the Act were an unfair or deceptive act or practice proscribed under Section

2  18(a)(1)(B) of the [FTC Act] (15 U.S.C. § 57a(a)(1)(B)).” That provision makes violations of

3  CAN-SPAM enforceable as though they were violations of an FTC Trade Regulation Rule.  In

4  order to recover civil penalties for violations of a Trade Regulation Rule, and thus for a

5  CAN-SPAM violation, the Government has to prove that IMG acted “with actual knowledge or

6  knowledge fairly implied on the basis of objective circumstances that such act is unfair or

7  deceptive and is prohibited,” 15 U.S.C. § 45(m)(1)(A).

8       Whether a defendant has violated a rule with actual or implied knowledge is
        based on objective factors.  A defendant is responsible where a reasonable person
9       under the circumstances would have known of the existence of the provision and
        that the action charged violated that provision.

10  United States v. Nat’l Fin. Servs., Inc., 98 F.3d 131, 139 (4th Cir. 1996) (citing legislative

11  history).

12       **A.  IMG’s Knowledge or Implied Knowledge of Violations**

13       IMG is liable for civil penalties under this standard.  IMG intended to pay and induce

14  affiliates when it knew or should have known that affiliates were sending spam in violation of

15  the law and IMG consciously avoided taking steps to determine how its affiliates were

16  promoting IMG’s websites.  IMG knew that some of its affiliates relied on unlawful spam as a

17  means to advertise IMG’s websites because IMG received complaints regarding affiliates

18  sending spam. Despite this knowledge IMG did little to stop its affiliates from violating the law

19  on its behalf.

20       Further, IMG was aware that it was operating in an environment conducive to spamming

21  because IMG operates in an on-line world and pays affiliates who successfully bring customers

22  to its websites through online advertising.  (SOF 11)  IMG’s agreement with affiliates to provide

23  advertising services foreseeably involved the affiliates’ use of on-line advertising including

24  email.  In the environment of spam on the Internet and Soulcash’s incentives and tools to

25  affiliates, the presence of violative spam is virtually inevitable rather than surprising.  IMG

26  cannot avoid liability by putting empty rhetoric in its contracts and claiming that it did not intend

27

28  Plaintiff’s Motion for                                              U.S. Department of Justice
    Summary Judgment                                                    P.O. Box 386
    CV05-1285L                                                          Washington, DC  20044
                                    -27-                                (202) 353-1991

the obvious results of its actions.

**B.  IMG Avoided Taking Steps to Determine How its Affiliates Were Promoting IMG's Websites**

IMG took no affirmative steps to monitor its affiliates to ensure that they were not using violative emails to promote IMG's websites.  IMG did not regularly ask affiliates what kinds of promotional tools they were using to promote IMG's websites (SOF 36(b)); IMG did not ask subscribers if they were directed to IMG's websites through emails sent by affiliates (SOF 36(a)); and IMG did not create a textlink on the first page of IMG's adult websites directing people who arrived there unwillingly to a complaint form (SOF 36(c)).  It would have been feasible for IMG to undertake any of these monitoring methods, but IMG chose not to inquire into its affiliates' marketing practices.  (SOF 34(a)-(c))

IMG exercised little caution during the affiliate sign-up process.  IMG's affiliates are the sales force of the company.  They are, to the extent there is one, the "face" of IMG.  Even though affiliates are provided with the marketing and promotional tools to introduce IMG to the public, IMG does not interview affiliate applicants, ask for references, or conduct any detailed review of affiliates as a part of the affiliate sign-up process.  (SOF 11-13)  IMG approves applicants even when the answers they provide on the affiliate sign-up questionnaire are senseless.  For example, affiliates who provided the names  "hjgjhgj," "ccc xzc," and "sfdsfd dsfsdfsd" were approved, provided a unique user ID, and granted access to IMG's promotional materials.  (SOF 14)  At bottom, IMG does not know, or care, who is advertising on its behalf.

IMG does have a provision in its Program Agreement that on paper restricts affiliates from sending commercial email in violation of CAN-SPAM and the Rule.  (SOF 30)  IMG's Program Agreement for affiliates states that IMG does not tolerate spamming and that IMG reserves the right to terminate an affiliate for spamming.  IMG claims that it has terminated twelve affiliates for spamming.  However, when asked for the specifics regarding these terminations, Seth Schermerhorn stated that he did not recall the specifics of any of these and that

Plaintiff's Motion for
Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1  IMG did not make a record of the reasons for the termination anywhere.[12]

2        IMG's words of compliance are more show than substance.  IMG took no concrete steps

3  to prevent affiliates from promoting IMG's websites through spam.  IMG did not even have

4  existing affiliates review the CAN-SPAM Act when the law went into effect or provide training

5  on the CAN-SPAM Act to its own employees. As illustrated by these facts, IMG's actual policy,

6  shown through its actions, was to reward affiliates who sent illegal spam.  In sum, IMG is liable

7  not only for injunctive relief but also for civil penalties on the basis of uncontested facts.

8  **VIII.    Conclusion**

9        By intentionally paying and otherwise inducing affiliates, IMG initiated email messages

10  that violate CAN-SPAM and the Adult Labeling Rule.  Sexually explicit email advertising

11  IMG's websites was sent through affiliates to in-boxes around the Internet.  IMG did not monitor

12  its affiliates, did not know who they were, and had a toothless anti-spam policy.  As a result,

13  hundreds of email messages were sent in violation of the law.  Congress passed that law, and the

14  FTC a regulation, to prevent precisely this result.  IMG violated the law and the regulation, and

15  should be held responsible.

16        For the reasons set forth above, summary judgment as to liability should be awarded to

17  the United States.

18

19

---

20        [12]  During the deposition of Seth Schermerhorn on August 10, 2006, Plaintiff attempted to

21  question Mr. Schermerhorn regarding Government Deposition Exhibit 1 ("Dep. Ex. 1") which was a list
of twelve affiliates produced by the Defendant allegedly terminated by IMG as a result of spam problems.

22  The Defendant objected to the Government's use of Dep. Ex. 1 because page two of Dep. Ex. 1 was a
truncated spreadsheet.  Based on the fact that the Defendant produced Dep. Ex. 1 to the Plaintiff in the

23  incomplete form and Plaintiff had requested a complete version of the spreadsheet prior to the deposition,
the parties agreed that the Plaintiff would propound written questions regarding the complete Exhibit

24  when it was produced by the Defendant and that Mr. Schermerhorn would answer Plaintiff's questions
regarding the Exhibit.  See Schermerhorn deposition, attached as Exhibit 9 at p. 79 lines 3-17.  Plaintiff

25  received the complete Exhibit from the Defendant on August 14, 2006.  Plaintiff sent the questions to the
Defendant on August 18, 2006.  Plaintiff followed up with the Defendant on August 28th and 31st and still

26  has not received a response to the questions.  Presumably if IMG's dealings with its affiliates in this

27  regard would be helpful to IMG in this litigation, the information would have been produced.

28  Plaintiff's Motion for                                          U.S. Department of Justice
Summary Judgment                                          P.O. Box 386
CV05-1285L                                                Washington, DC  20044
                                      -29-                 (202) 353-1991

DATED: September 5, 2006              Respectfully submitted,

FOR PLAINTIFF UNITED STATES:
PETER D. KEISLER
Assistant Attorney General,
Civil Division
U.S. DEPARTMENT OF JUSTICE

JOHN McKAY
United States Attorney

BRIAN KIPNIS
Assistant U. S. Attorney for the
Western District of Washington
700 Stewart Street
PHONE: (206) 553-7970
FAX: (206) 553-0882

EUGENE M. THIROLF
Director
Office of Consumer Litigation

KENNETH L. JOST
Assistant Director
Office of Consumer Litigation

JEFFREY STEGER
Trial Attorney
Office of Consumer Litigation

By:    /s/ Lauren E. Hash
LAUREN E. HASH
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
Telephone: (202) 353-1991
Facsimile: (202) 514-8742
Lauren.Hash@usdoj.gov

Plaintiff's Motion for
Summary Judgment
CV05-1285L

-30-

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such to the following CM/ECF registrant:

Robert S. Apgood
CarpeLaw PLLC
2400 NW 80th Street #130
Seattle, WA 98117-4449

By:    /s/ Lauren E. Hash
Lauren E. Hash
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
Telephone: (202) 353-1991
Facsimile: (202) 514-8742
Lauren.Hash@usdoj.gov

Plaintiff's Motion for
Summary Judgment
CV05-1285L

-31-

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991