**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**IMPULSE MEDIA GROUP, INC.,**<br><br>a Washington corporation,<br><br>Defendant. | No. CV05-1285L<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

**I.   Introduction**

Plaintiff United States of America ("United States"), by and through its counsel, submits this Memorandum of Law in Opposition to the Motion by Defendant Impulse Media Group, Inc. ("IMG") for Summary Judgment.[1]  The United States brought this action under the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM" or "the Act"), 15 U.S.C. § 7701 et seq., and the Federal Trade Commission's Adult Labeling Rule (the "Adult Labeling Rule" or the "Rule"), 16 C.F.R. § 316, against Defendant IMG.  The case concerns Defendant's liability for sexually explicit spam that was broadcast to in-boxes across the Internet advertising Defendant's adult content websites.  Under agreed facts and the plain meaning of the Act, Defendant's Motion for Summary Judgment must be denied, as Defendant is

---

[1] This response is supported by and incorporates by reference Plaintiff's Motion and Memorandum in Support of Summary Judgment and Statement of Facts ("SOF") (Docket #17)(hereinafter "Plaintiff's Motion and Memorandum"), and all exhibits previously filed in support of Plaintiff's Motion for Summary Judgment.

| | |
|---|---|
| Plaintiff's Response to Defendant's<br>Motion for Summary Judgment<br>CV05-1285L | U.S. Department of Justice<br>P.O. Box 386<br>Washington, DC  20044<br>(202) 353-1991 |

liable for the violations that took place.

The parties have filed cross-motions for summary judgment that disagree not on the facts of the case, but on what the law requires to impose liability for a violation of CAN-SPAM. The parties agree that IMG "affiliates" sent spam which does not comply with the Act. The parties agree on the contractual relationship between IMG and its affiliates that induced the affiliates to drive prospective members to IMG's websites. The parties also agree that IMG paid its affiliates when new members, attracted by the affiliates, signed up for those websites. What the parties disagree on, however, is what steps Congress took to prevent such email from being sent in the first place.

Congress recognized that there was often a distinction between firms that benefit from sexually explicit spam, and entities that actually push the button to send the spam. The United States contends that Congress, motivated in large measure by a desire to prevent pornographic email from being delivered to children, deliberately excluded a "knowledge" requirement from the pertinent provision of CAN-SPAM to expressly impose liability for injunctive relief on both those that induce spam and the button pushers, thus reaching firms like IMG that motivate and provide consideration to others who send sexually explicit email to non-consenting recipients. The United States contends that Congress imposed a "knowledge" requirement only in connection with criminal liability or liability for civil penalties. IMG, on the other hand, contends that Congress only meant to impose liability, even for injunctive relief, on those entities that could be proven to have a specific intent to purposely and knowingly solicit others to send illegal spam on their behalf. However, as discussed in Section V(A)(2) and (3), *infra*, the text, structure, and legislative history of the Act unequivocally show that no such mens rea requirements exist.

There is no genuine dispute of the facts that compel liability under the standard Congress enacted. As discussed in Section III, *infra*, IMG operated an affiliate program and induced affiliates to bring paying customers to IMG as a part of the Soulcash affiliate program by providing them with marketing materials and support, and paying them for bringing customers to

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 2 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

IMG. Further, the evidence shows, and the Defendant does not dispute, that IMG affiliates promoted IMG's websites through unsolicited commercial email messages that contained sexually oriented material that violated CAN-SPAM and the Adult Labeling Rule. Therefore, summary judgment is appropriate in this case, but in favor of the United States.

As demonstrated below, IMG should be held liable for both injunctive relief and civil penalties. IMG's liability for injunctive relief rests on its having intentionally induced affiliates to initiate violative emails. While there is no knowledge requirement for injunctive relief, there is such an element in the civil penalty calculus. As discussed in Section V(B), *infra*, IMG's liability for civil penalties follows from its actual and implied knowledge of its affiliates' activities and of CAN-SPAM. The contours of any injunction and the amount of any civil penalty will be decided in later proceedings.

## II.    Background on CAN-SPAM and the Adult Labeling Rule[2]

Congress enacted CAN-SPAM and directed the Federal Trade Commission ("FTC") to promulgate the Adult Labeling Rule in part to protect email recipients from being exposed to sexually explicit material without taking an affirmative step to see the material. The Act requires a warning and an opt-out mechanism to appear in the initially viewable area of sexually explicit email, and bans sexually explicit material from that area. The Act and Rule thus protect recipients from unintentionally viewing material that may be vulgar or pornographic. The Act was explicitly intended to protect minors from being exposed to such material.

The Act and Rule also provide recipients of unsolicited commercial email messages, whether or not the messages are sexual in nature, the opportunity to contact the sender and request not to receive further messages.

Under the Act and the Rule, any person who initiates the transmission to a protected computer of any commercial email message that includes sexually oriented material must

---

[2] To avoid undue repetition, this section includes a much abbreviated discussion of the background of CAN-SPAM, compared to a similar section in the Government's Summary Judgment Memorandum. *See* Docket #17 at pp. 15-20.

| | |
|---|---|
| Plaintiff's Response to Defendant's<br>Motion for Summary Judgment<br>CV05-1285L | U.S. Department of Justice<br>P.O. Box 386<br>Washington, DC  20044<br>(202) 353-1991 |

include the phrase "SEXUALLY-EXPLICIT: " at the beginning of the subject line in the header of the message. CAN-SPAM and the Adult Labeling Rule also require that when recipients of commercial email messages with sexually oriented material open the email, they see only the following: (1) "SEXUALLY-EXPLICIT: "; (2) identification that the message is an advertisement or solicitation; (3) notice of the opportunity to decline to receive further spam from the sender; (4) a functioning return email address that a recipient may use to submit a reply email message requesting not to receive future spam from the sender; (5) a valid physical postal address of the sender; and (6) instructions on how to access the sexually oriented material. *See* 15 U.S.C. § 7704(d)(1); 16 C.F.R. § 316.4(a).

CAN-SPAM itself also requires that spam provide notice of an opt-out provision and bear a valid physical postal address of the sender. *See* 15 U.S.C. § 7704(a)(5). These last two provisions apply whether or not the email contains sexually oriented material.

**III.    Factual Background**

The undisputed facts are set forth at pages 3 through 14 of Plaintiff's Motion and Memorandum. Below, the government sets forth a brief summary of the operative facts.

**A.    IMG Induced Affiliates to Send Violative Messages**

There is no genuine dispute that IMG operated an affiliate program called "Soulcash," that IMG provided affiliates with marketing materials and support, that IMG paid affiliates for bringing paying customers to IMG as a part of the Soulcash affiliate program, that IMG induced affiliates to bring paying customers to IMG as a part of the Soulcash affiliate program, that affiliate members of the Soulcash program promoted IMG's websites through unsolicited commercial email messages that contain sexually oriented material, and that these messages violate CAN-SPAM and the Adult Labeling Rule.[3]

Affiliates of the Soulcash program are provided marketing materials to advertise IMG's websites and earn money each time they refer a customer who subscribes to one of IMG's adult

---

[3] The operation of Soulcash is detailed in the Plaintiff's SOF at ¶¶ 9-27.

Plaintiff's Response to Defendant's  
Motion for Summary Judgment  
CV05-1285L

Page 4 of 17

U.S. Department of Justice  
P.O. Box 386  
Washington, DC  20044  
(202) 353-1991

websites. (SOF 10, 18, 19) IMG provides these marketing and promotional tools to affiliates to "give the affiliate a means to drive new . . . prospective website members to our [IMG's] sites." (SOF 20) IMG has two payment plans for affiliates, "per sign-up" and "50/50 rev share." (SOF 26) As part of the affiliate program, IMG provides assistance to affiliates through a support system that allows affiliates to send questions to IMG and receive responses, "via toll and toll free telephone numbers posted in the footer of every page," and through email communications and instant messenger. (SOF 24) IMG also provides detailed sales statistics to affiliates. (SOF 23) IMG even sends a notification email to an affiliate each time the affiliate is credited with a subscription to an IMG website. (SOF 25)

Affiliates on the per sign-up payment plan are paid more per sale the more sales they refer to IMG's websites. Affiliates on the "rev share" program earn fifty percent of the payments made by a subscriber. (SOF 26) IMG also runs bonus payouts to encourage affiliates to bring subscribers to IMG's websites. (SOF 27) Several of the affiliates who sent the violative emails at issue were paid for successfully recruiting subscribers to IMG's adult websites. IMG paid affiliate "b32day" $1,634.97 (SOF 49); affiliate "scorpion" $2,057.00 (SOF 54); affiliate "teddybear" $2,367.16 (SOF 58); affiliate "dacash" $8,121.27 (SOF 56); and affiliate "a313372" $4,201.47 (SOF 51).

While many of the affiliates who sent violative emails received payment for the sales they referred to IMG, the CAN-SPAM Act does not require an affiliate to be paid for sending violative emails in order for a violation to occur. A company could be liable as an initiator of violative emails without ever paying an affiliate for its services. This is because the Act imposes liability on a company that procures the initiation or transmission of a message, and a company can procure the initiation of a violative email by paying an affiliate *or* by inducing an affiliate to send violative email. Inducement is sufficient because it is the procuring of the initiation of the email that creates the forbidden result, *i.e.*, the sending of the violative email. After-the-fact payment to the affiliate by a company is a telling, but not a necessary component of liability.

**B.     IMG's Knowledge or Implied Knowledge of Violations**

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 5 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

IMG intended to induce affiliates when it knew or should have known that affiliates were sending spam in violation of the law and IMG consciously avoided taking steps to determine how its affiliates were promoting IMG's websites. (SOF 34-36) IMG knew that some of its affiliates relied on unlawful spam as a means to advertise IMG's websites because IMG received complaints regarding affiliates sending spam. (SOF 32) Despite this knowledge IMG did little to stop its affiliates from violating the law on its behalf.

Further, IMG was aware that it was operating in an environment conducive to spamming because IMG operates in an on-line world and pays affiliates who successfully bring customers to its websites through on-line advertising. (SOF 11, 29) IMG's agreement with affiliates to provide advertising services foreseeably involved the affiliates' use of on-line advertising including email. In responding to discovery, IMG identified electronic mail and electronic newsletter marketing as examples of a type of marketing IMG affiliates may choose to use. (SOF 29)

In addition, IMG took no affirmative steps to monitor its affiliates to ensure that they were not using violative emails to promote IMG's websites. IMG did not regularly ask affiliates what kinds of promotional tools they were using to promote IMG's websites (SOF 36(b)); IMG did not ask subscribers if they were directed to IMG's websites through emails sent by affiliates (SOF 36(a)); and IMG did not create a textlink on the first page of IMG's adult websites directing people who arrived there unwillingly to a complaint form (SOF 36(c)). It would have been feasible for IMG to undertake any of these monitoring methods, but IMG chose not to inquire into its affiliates' marketing practices. (SOF 34(a)-(c))

IMG exercised little caution during the affiliate sign-up process. IMG's affiliates are the sales force of the company. Even though affiliates are provided with the marketing and promotional tools to introduce IMG to the public, IMG does not interview affiliate applicants, ask for references, or conduct any detailed review of affiliates as a part of the affiliate sign-up process. (SOF 11-13) IMG approves applicants even when the answers the applicants provide on the affiliate sign-up questionnaire are senseless. For example, affiliates who provided the

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 6 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-1991

names "hjgjhgj," "ccc xzc," and "sfdsfd dsfsdfsd" were approved, provided a unique user ID, and granted access to IMG's promotional materials. (SOF 14)

IMG does have a provision in its Program Agreement that on paper restricts affiliates from sending commercial email in violation of CAN-SPAM and the Rule. (SOF 30) IMG's Program Agreement for affiliates states that IMG does not tolerate spamming and that IMG reserves the right to terminate an affiliate for spamming. IMG claims that it has terminated twelve affiliates for spamming,[4] however, as explained in the paragraph immediately below, IMG did not always terminate all of an affiliate's accounts when one of the affiliate's accounts was terminated for sending spam.

After the United States filed its Motion for Summary Judgment, the Defendant provided written answers to Government Deposition Exhibit 31. *See* Exhibit 21. Based on this additional evidence provided by the Defendant, the United States has two additional undisputed facts. First, the affiliate accounts "scumbag" and "cracker" are operated by the same person. These two accounts were registered under the same name and physical address. Affiliate accounts "scumbag" and "cracker" both directed that their payments be made in the same name of Angelina Johnson (Excerpts from Response No. 4 to Document Requests - Affiliate Information, attached as Sealed Exhibit 23) (SOF 65). Second, the affiliate account "cracker" was not shut down when the account "scumbag" was terminated for sending spam. The affiliate account "cracker" is currently an active IMG affiliate account. (Response to Question 12 on Government Deposition Exhibit 31, attached as Exhibit 21) (SOF 66).

## IV. Legal Standard

The parties do not disagree that summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

---

[4] When asked for the specifics regarding these terminations, IMG's owner and president Seth Schermerhorn stated that he did not recall the specifics of any of these terminations and that IMG did not make a record of the reasons for the termination anywhere. *See* Exhibit 21 at p. 14; Schermerhorn deposition, attached as Exhibit 22 at p. 35 line 25 to p. 36 line 22.

Plaintiff's Response to Defendant's  
Motion for Summary Judgment  
CV05-1285L

U.S. Department of Justice  
P.O. Box 386  
Washington, DC 20044  
(202) 353-1991

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Baccarat Fremont Developers v. U.S. Army Corps of Eng'rs*, 425 F.3d 1150, 1158 (9th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Rollison v. Hotel, Motel, Rest.*, 677 F.2d 741, 745 (9th Cir. 1982).

**V.    Argument**

IMG is liable for initiating the transmission of hundreds of unsolicited commercial email messages that violate CAN-SPAM and the Adult Labeling Rule. These are the emails that are the subject of the United States' Motion for Summary Judgment. *See* Docket #17; Ex. 15. IMG affiliates promoted IMG's websites through unsolicited commercial email messages that contain sexually oriented material and violate CAN-SPAM and the Rule.

IMG does not deny this. *See* at Def. S.J. Mem. at p. 11. Indeed, it admits that it "entered into agreements with the third parties [the affiliates who sent the emails] whereby it paid those third parties a commission, or 'finders fee,' for sales resulting from referrals by those third parties to Defendant[']s Web sites." Def. S.J. Mem. at p. 5. Defendant attempts to draw a distinction between this practice and paying the third parties to market or advertise Defendant's websites. *Id.* This distinction has no legal significance under CAN-SPAM.

Defendant does not disagree with the government concerning the facts surrounding the relationship between IMG and its affiliates, it merely argues that those facts do not make IMG liable for the violations. IMG argues that it cannot be found liable because it did not "know or authorize or permit or suffer" the CAN-SPAM violations. *Id.* at 6. IMG argues that "for liability to attach" the Act requires that IMG paid its affiliates

> to commit the **specific** act of sending "a commercial electronic mail message" that violates the Act. Even mere compensation for general advertising is not enough under the Act. Such payment must be **intentionally** made by Defendant to obtain the specific and actual result of the third person sending such an e-mail.

*Id.* at 10 (emphasis in original). In this, IMG could not be more wrong. The Act does not require any showing of specific intent or knowledge for liability to attach here. Rather, IMG's

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 8 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

procurement of violative email makes IMG liable for injunctive relief for violating the Act. Furthermore, while not necessary for injunctive relief, IMG's actual or constructive knowledge of the violations is sufficient to make it liable for civil penalties pursuant to CAN-SPAM and the FTC Act.

### A. Liability for Injunctive Relief for Violating CAN-SPAM and the Rule

#### 1. The Words of the Statute

Liability under CAN-SPAM is assessed for "initiating" email messages that violate the statute. 15 U.S.C. § 7704(a)(1) ("It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message . . . ."); 15 U.S.C. § 7704(a)(5)(A) (same). Under CAN-SPAM:

> The term "initiate," when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message. For purposes of this paragraph, more than one person may be considered to have initiated a message.

15 U.S.C. § 7702(9). CAN-SPAM defines "procure" as follows:

> The term "procure," when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf.

15 U.S.C. § 7702(12).

IMG is liable for the email messages violating CAN-SPAM and the Rule because IMG procured their initiation. IMG induced affiliates to send emails (both violative and non-violative) through promises of payment and extensive affiliate support. Thus, IMG procured the transmission of the violative emails, including the hundreds of emails detailed in the Government's Motion for Summary Judgment. As such, IMG initiated the unlawful email messages and violated CAN-SPAM and the Rule.

#### 2. Statutory History and Structure of CAN-SPAM

As discussed in Plaintiff's Motion and Memorandum, Congress, motivated in large measure by a desire to prevent pornographic email from being delivered to children, deliberately excluded a "knowledge" requirement from the pertinent provision of CAN-SPAM to expressly

Plaintiff's Response to Defendant's  
Motion for Summary Judgment  
CV05-1285L

U.S. Department of Justice  
P.O. Box 386  
Washington, DC 20044  
(202) 353-1991

impose liability for injunctive relief on both "button pushers" and those who induce the "button-pushers," thus reaching firms like IMG that motivate and provide consideration to others to send sexually explicit email to non-consenting recipients. Plaintiff's Motion and Memorandum at pp. 16-17. As discussed in Plaintiff's Motion and Memorandum, the text, structure, and legislative history of the Act unequivocally show that IMG is liable for injunctive relief regardless of IMG's knowledge of its affiliate's activities. The legislative history of the Act demonstrates that Congress specifically rejected a knowledge requirement in the relevant section of CAN-SPAM. Congress demonstrated its intent to impose a lower burden of proof for injunctive relief against entities such as IMG in a civil government enforcement action by placing a "knowledge" element in other CAN-SPAM provisions, such as the criminal provision and the section allowing enforcement by Internet Service Providers, even as it deleted "knowledge" as an element in cases such as this one. Plaintiff's Motion and Memorandum at pp. 24-26.

Congress has imposed even more stringent liability on violators without a knowledge element than it did in CAN-SPAM in other arenas where Congress sought to eliminate what it viewed as particularly grave problems. For example, in protecting migratory birds, Congress made it a crime to kill a bird, with absolutely no regard to state of mind. *See*, *e.g.*, *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978) (holding company liable under the Migratory Bird Treaty Act for unintentional death of birds resulting from dumping waste water); *United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 532-35 (E.D. Cal. 1978) (holding that the Migratory Bird Treaty Act can constitutionally be applied to impose criminal liability on those who did not intend to kill migratory birds), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978). Similarly, in passing the Federal Food, Drug, and Cosmetic Act, Congress imposed criminal liability on anyone with a "responsible relation" to a violation. *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). "[T]he Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur. . . . The Act does not . . . make criminal liability turn on 'awareness of some wrongdoing' or 'conscious fraud.'" *United States v. Park*, 421 U.S. 658, 672-73 (1975). Congress left it to the discretion of enforcement authorities to determine

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

appropriate cases to bring.[5] *See Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 598-99 (1950); *United States v. FMC Corp.*, 572 F.2d 902, 905 (2d Cir. 1978) (noting that "the sound discretion of prosecutors and the courts" would limit the scope of the Migratory Bird Treat Act's strict liability provisions to prevent results that would offend reason and common sense).  In sum, Congress has imposed stringent liability on violators when it sought to eliminate particularly grave problems, even imposing criminal liability with no element of knowledge.  CAN-SPAM is another instance of Congress imposing liability without requiring the government to prove knowledge to obtain, in this instance, some sort of injunctive relief.

The colloquy between Senators Burns and Wyden that Defendant cites further supports IMG's liability for the affiliate emails at issue.[6] Def. S.J. Mem. at p. 14.  In response to Senator Burns' question "Can't the FTC, State A.G.s, and Internet Service Providers bring actions under section 5 against parties who aren't themselves spamming, but rather hire spammers to promote their products and services," Senator Wyden responds: "Absolutely.  The bill's definition of 'initiate' makes that clear, because it applies not only to the spammer that originates the actual email, but also to a party who has hired or otherwise induced the spammer to send the e-mail on its behalf.  If the e-mail message violates the bill, both parties would be on the hook under section 5, and enforcement would be possible against both or either parties." 149 Cong. Rec. S15943, 15945 (2003).  The Senators' colloquy confirms that Congress intended that multiple parties (*e.g.*, merchants and spammers) may both be liable under CAN-SPAM for the same email.  This is also confirmed by the definition of "initiate" ("For purposes of this paragraph, more than one person may be considered to have initiated a message."). 15 U.S.C. § 7702(9).

IMG asserts that the colloquy demonstrates that section 5 requires intent to violate the law whereas section 6 does not.  This interpretation finds no support in the statute or the colloquy.

---

[5] Enforcement discretion in bringing injunctive cases provides the answer to IMG's car dealer dilemma.  *See* Def. S.J. Mem. at p. 13.

[6] The Complaint alleges that IMG violated section 5 of the Act.  Section 5 of the Act is 15 U.S.C. § 7704.  Section 6 of the Act is 15 U.S.C. § 7705.

| | |
|---|---|
| Plaintiff's Response to Defendant's<br>Motion for Summary Judgment<br>CV05-1285L | U.S. Department of Justice<br>P.O. Box 386<br>Washington, DC  20044<br>(202) 353-1991 |

With respect to the statute, section 6 relates exclusively to violations of 15 U.S.C. § 7704(a)(1) and materially false or misleading header information in an email, whereas section 5 relates to a broader range of email, including email containing sexually explicit material. The government's complaint here concerns violations of section 5, specifically 15 U.S.C. §§ 7704(a)(3), (a)(5) and (d)(1). These latter sections of the law do not relate to email where the header information is materially false or misleading.

With respect to the colloquy, the Senators are not discussing "intent" as it relates to third parties and sexually explicit email. Senator Burns' statement that "what is different about section 6, as I understand it, is that section 6 does not require any showing that the merchant actually hired or induced the spammer to send the spam," applies in the context of false or misleading header information. 149 Cong. Rec. S15943, 15945 (2003). Senator Burns immediately thereafter stated: "if the spammer is hard to find and his contractual relationship with the merchant has been obscured by under-the-table dealings, the FTC doesn't have to spend time and effort trying to prove the relationship." *Id.* These statements make sense in the context of false or misleading header information, because it may be hard to find the button pusher or establish the relationship between the button pusher and person benefitting from the illegal email. Despite IMG's assertions, the Senators are not discussing "intent" as it relates to the type of email at issue here.

### 3. IMG Violated CAN-SPAM and the Adult Labeling Rule

The Defendant's sole argument is that it did not intentionally pay or intentionally induce any person with specific intent to initiate prohibited emails. IMG attempts to read into a civil violation in a government enforcement action a knowledge requirement that Congress specifically considered, and deleted, from a bill before passing it as law. As Congress made clear, the government is not required to show specific intent for a civil violation to attach. Rather, the statute requires that IMG did not accidentally pay or accidentally induce its affiliates to send commercial email on its behalf. This conclusion flows from the presence of "intentionally" in the definition of "procure."

The meaning of "intentionally" and "knowingly" in various statutes may vary, and

Plaintiff's Response to Defendant's  
Motion for Summary Judgment  
CV05-1285L

U.S. Department of Justice  
P.O. Box 386  
Washington, DC 20044  
(202) 353-1991

confusion persists in this area of the law.  Here, Congress created a two-tiered system of liability in government enforcement actions.  To obtain injunctive relief, the government must show that a "procuring" defendant "intentionally" paid or induced another person to initiate a message. 15 U.S.C. § 7702(12).  For criminal liability, the government must show that a procurer acted "knowingly."  15 U.S.C. 7704(d)(5).  In this context, it would make no sense to read "intentionally" as imposing more of a burden in a civil injunction case than required by the "knowingly" requirement in a criminal case.

IMG argues that to obtain injunctive relief, the government must show that IMG acted "intentionally" in the sense of with a purpose of procuring email.  IMG claims that CAN-SPAM "requires that the Defendant acted towards the [affiliate] in a manner so as to actually cause the [affiliate] to specifically send an e-mail.  If Defendant did not intentionally act with such end result in mind, Defendant is not liable under the Act."  Def. S.J. Mem. at p. 11.  Similarly, IMG argues that to be liable it "must have intended the actual sending of the e-mails as the end result of such payment or inducement."   Def. S.J. Mem. at p. 11.  Defendant reads far too much into the word "intentionally" in section 7702(12).

IMG conflates the concepts of "general intent" and "specific intent" and thereby ignores the requirement that Congress actually created for injunctive relief for the relevant CAN-SPAM violations.  The type of intent set forth in IMG's brief as quoted above, acting with a specific mindful purpose of causing e-mail to be sent, is "specific intent."  As the Ninth Circuit has said, "'purpose' corresponds to the concept of specific intent, while 'knowledge' corresponds to general intent." *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000).  "A person who causes a result prohibited by common law or statute is said to have acted purposely if he or she consciously desired that result . . . ."  *Id.*

IMG argues that to obtain injunctive relief, the government must show such specific intent.  But even in a criminal case, the government need only show "knowledge" under section 7704(d)(5), and "knowledge" is consistent with general rather than specific intent.  Here, the government only alleges civil violations, so it would be absurd to require proof of purpose which is not even required in a criminal prosecution.  The word "intentionally" simply does not require

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 13 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

the specific intent that IMG asserts: requiring that a defendant act "intentionally or voluntarily is consistent with general, rather than specific intent." *United States v. Martinez*, 49 F.3d 1398, 1401 n.5 (9th Cir. 1995).

If IMG accidentally procured the sending of violative spam, the word "intentionally" would shield it from liability. For example, consider this hypothetical. IMG officers contemplate an affiliate program that paid spammers to send violative email. IMG created draft web pages and email, and had these items on its computers. IMG decided not to implement this program, but a hacker penetrated IMG's computers and thought the program was genuine, and used IMG's emails to spam the Internet, expecting to be rewarded by IMG for so doing. Despite the fact that IMG would have "induced" the violative spam, the inducing would have been accidental rather than intentional, so no liability would attach. But where, as in reality, IMG's deliberate and non-accidental policies procure violative spam, particularly where that result is quite foreseeable, IMG is liable.

### B. Liability for Civil Penalties

Pursuant to Section 7(a) of CAN-SPAM, the Act "shall be enforced by the [Federal Trade] Commission as if the violation of this Act were an unfair or deceptive act or practice proscribed under Section 18(a)(1)(B) of the [FTC] Act (15 U.S.C. 57a(a)(1)(B))." That provision makes violations of CAN-SPAM enforceable as though they were violations of an FTC Trade Regulation Rule. In order to recover civil penalties for violations of a Trade Regulation Rule, and thus for a CAN-SPAM violation, the government has to prove that IMG acted "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited," 15 U.S.C. § 45(m)(1)(A).

> Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors. A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision.

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (citing legislative history).

IMG is liable for civil penalties under this standard. IMG intended to induce affiliates

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 14 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

when it knew that affiliates were sending spam in violation of the law and IMG consciously avoided taking steps to determine how its affiliates were promoting IMG's websites.[7] Further, IMG was aware that it was operating in an environment conducive to spamming because IMG operates in an on-line world and pays affiliates to bring customers to its websites through on-line advertising.  (SOF 1, 11)  IMG's agreement with affiliates to provide advertising services foreseeably involved the affiliates' use of on-line advertising including email.  IMG even knew that some of its affiliates were using spam to promote IMG's websites.  IMG cannot avoid liability by putting empty rhetoric in its contracts and claiming that it did not intend the obvious results of its actions.

In sum, IMG is liable not only for injunctive relief but also for civil penalties on the basis of uncontested facts.[8]

## VI. Conclusion

For the foregoing reasons, the Court should deny IMG's Motion for Summary Judgment. Rather, summary judgment finding liability for injunctive relief and civil penalties should be entered against IMG.  The scope of the injunction and amount of civil penalties will be determined in subsequent proceedings.

DATED: September 25, 2006         Respectfully submitted,

FOR PLAINTIFF UNITED STATES:
PETER D. KEISLER
Assistant Attorney General,
Civil Division
U.S. DEPARTMENT OF JUSTICE

JOHN McKAY
United States Attorney

---

[7] *See* section (III)(B), *supra*; the Government's Summary Judgment Memorandum, Docket #17 at 26-29; and cited sections of the Statement of Facts, for further detail regarding IMG's actual and constructive knowledge of the violations.

[8] Even if Congress had placed a knowledge requirement in the statute for the government to obtain injunctive relief as IMG contends, the facts discussed in this section demonstrate that summary judgment for the Defendant would nevertheless remain inappropriate.

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 15 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC  20044
(202) 353-1991

BRIAN KIPNIS
Assistant U. S. Attorney for the
Western District of Washington
700 Stewart Street
PHONE: (206) 553-7970
FAX: (206) 553-0882

EUGENE M. THIROLF
Director
Office of Consumer Litigation

KENNETH L. JOST
Assistant Director
Office of Consumer Litigation

JEFFREY STEGER
Trial Attorney
Office of Consumer Litigation

By:  /s/ Lauren E. Hash
     LAUREN E. HASH
     Trial Attorney
     Office of Consumer Litigation
     U.S. Department of Justice
     P.O. Box 386
     Washington, DC 20044
     Telephone: (202) 353-1991
     Facsimile: (202) 514-8742
     Lauren.Hash@usdoj.gov

Plaintiff's Response to Defendant's
Motion for Summary Judgment
CV05-1285L

Page 16 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-1991

**CERTIFICATE OF SERVICE**

    I hereby certify that on September 25, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such to the following CM/ECF registrant:

        Robert S. Apgood
        CarpeLaw PLLC
        2400 NW 80th Street #130
        Seattle, WA 98117-4449

By: /s/ Lauren E. Hash
     Lauren E. Hash
     Trial Attorney
     Office of Consumer Litigation
     U.S. Department of Justice
     P.O. Box 386
     Washington, DC 20044
     Telephone: (202) 353-1991
     Facsimile: (202) 514-8742
     Lauren.Hash@usdoj.gov

Plaintiff's Response to Defendant's Motion for Summary Judgment
CV05-1285L

Page 17 of 17

U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-1991