HON. ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IMPULSE MEDIA GROUP, INC., a Washington corporation,<br><br>Defendant. | **No. CV 05-1285L**<br><br>DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

The Defendant is mystified with the amount of time and space that the Plaintiff has devoted in its opposition to discussion of the facts of this case. The Defendant has stipulated to the relevant facts, as it must for the purpose of its motion for summary judgment. Yet the Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Response") has provided not only a reiteration of its particular interpretation of the facts (which bears an eerie similarity to the statement of "undisputed" facts that the Plaintiff proffered in its own Motion for Summary Judgment), but also has provided argument applying these facts to the Plaintiff's interpretation of the law. However, Defendant's argument in its Motion for Summary Judgment is based solely upon matters of pure law. The argument is not that there is no genuine issue of material fact. For the purpose of its Motion, the Defendant concedes, as it must, that there is no genuine issue of material fact. The Defendant's argument is that, even with stipulated facts taken in a light most favorable to the Plaintiff, the Defendant has no liability *as a matter of law* because the law, as properly interpreted, simply *does not allow for liability* to affix to the Defendant based upon the facts. The

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 1

**CARPELAW** PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

1   Plaintiff apparently believes that its Response is yet another opportunity for the Plaintiff to reassert
2   its arguments made in its own Motion for Summary Judgment.  This belief is, of course, erroneous.
3   For the Defendant's response to the Plaintiff's factual assertions in this case, the Defendant asks this
4   Honorable Court to refer to the Defendant's Response in Opposition to the Plaintiff's Motion for
5   Summary Judgment.  In this Reply, the Defendant will not address the Plaintiff's re-assertion of its
6   factual arguments except to the extend that it is necessary to demonstrate that Plaintiff has not met
7   its burden to present facts rebutting Defendant's argument in its motion.

**The Construction of "Procure"**

9   The definition of "procure" under 15 U.S.C. § 7702(12) states that "when used with respect
10  to the initiation of a commercial electronic mail message, means intentionally to pay or provide
11  other consideration to, or induce, another person to initiate such a message on one's behalf."  The
12  Plaintiff asserts that

> IMG argues that, "for liability to attach" the Act requires that IMG paid its affiliates to commit the **specific** act of sending "a commercial electronic mail message" that violates the Act. Even mere compensation for general advertising is not enough under the Act. Such payment must be **intentionally** made by Defendant to obtain the specific and actual result of the third person sending such an illegal e-mail. *Id*. at 10 (emphasis in original). In this, IMG could not be more wrong. The Act does not require any showing of specific intent or knowledge for liability to attach.

18  Plaintiff's Response in Opposition to Defendant IMG's Motion For Summary Judgment
19  ("Response") at 8:21-25.  However, from a construction standpoint, Plaintiff's argument begs the
20  question of precisely what Congress meant when it employed the word "intentionally" within the
21  definition of "procure" as found in 15 U.S.C. § 7702(12). That definition of "procure" includes the
22  word "intentionally."  Since the definition of "procure" is a compound sentence, it must be read as
23  "**intentionally** to pay another person to initiate such a message on one's behalf," or "**intentionally** to
24  provide other consideration to another person to initiate such a message on one's behalf," or
25  "**intentionally** to induce another person to initiate such a message on one's behalf."  Breaking down
26  the sentence into its elemental forms demonstrates that Plaintiff's reading of the statute disregards
27  the word "intentionally."   Under the statutory definition, to procure another, the Defendant must
28  "intentionally" do something. In other words, the Defendant must actually seek the end result or

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 2

**CARPELAW** PLLC
2400 NW 80th Street  #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

1  obtain it with knowledge. The word "intentionally" cannot simply be ignored. As the 9th Circuit has
2  noted, "[i]nterpretative constructions of a statute which would render some words surplusage, defy
3  common sense, or lead to mischief or absurdity are to be avoided." *Pacific Mut. Life Ins. Co. v.*
4  *American Guaranty Life Ins. Co.*, 722 F.2d 1498, (9th Cir. 1984).

    Therefore, if the word "intentionally" cannot be ignored, then it must be determined what the word modifies. Simply put, three things: (1) intentionally to pay; (2) intentionally to provide; or (3) intentionally to induce. There can be no other "plain language" construction. Even Plaintiff would likely concede the construction to this point, because it is precisely at this point that Plaintiff deviates from the plain language construction.

    Plaintiff suggests that simply because Defendant intentionally paid others or intentionally provided other compensation to third parties for any reason, liability under the Act attaches. Plaintiff clearly states: "IMG induced affiliates to send emails (both violative and non-violative) through promises of payment and extensive affiliate support. Thus, IMG procured the transmission of the violative emails…." Response at 9:19-21. In other words, the Plaintiff is clearly arguing that the only thing necessary to impose liability on Defendant is merely that Defendant "induced" its affiliates *for any purpose*. However, such a construction is an incomplete construction, and an incomplete construction inevitably leads to an erroneous application of the statute.

    The analysis cannot stop here because the language of the statute does not stop here. To "procure" under § 7702(12) does not simply mean "to pay" another person, or "to induce" another person. The wrongful act of procurement under CAN-SPAM is to pay or induce another person to do something. The statute defines what that something is, to wit: "to initiate such a message on one's behalf."[1] This language simply cannot be ignored. Yet, to uphold Plaintiff's construction it necessarily must be completely and entirely disregarded.

    When Congress defined "procure," it clarified and qualified which payments, or other considerations or inducements fell within the definition; i.e. only those payments intentionally made to others "to initiate such a message on one's behalf" are included. If payment was not for that

---

[1] In this case, the preceding language defines "such a message" as a "commercial electronic mail message"

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 3

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

purpose, then it was not intended to be included within the definition. Nevertheless, Plaintiff's unceasing and repetitive argument is that Defendant paid affiliates, affiliates sent e-mails, therefore Defendant procured them to send e-mails.[2] However, Congress did *not* define "procure" as "to pay or provide other consideration to, or induce, another person **who initiates** such a message on one's behalf." If it had, there would be no doubt as to the propriety of the Plaintiff's position. Under such language, if the third party were paid any money for *any* purpose, and the third party sent an e-mail, the paying party would be liable for the act regardless of the paying party's intent.

However, instead of such universally encompassing language, Congress employed the language to include the term "to initiate" and that can only support one and only one plain language construction; i.e. that the paying party must have intentionally paid the third party *to initiate the message*. Payment for any other purpose is not actionable.[3] Not one sound plain language construction of the statute can disregard this evident and inevitable outcome.

On the contrary, the canon of construction *noscitur a sociis* shows the error of Plaintiff's argument. "[A] word is understood by the associated words. *Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1185 (quoting *United States v. Lacy*, 119 F.3d 742, 748 (9th Cir. 1997), cert. denied, 523 U.S.1101, 140 L. Ed. 2d 804, 118 S. Ct. 1571 (1998)). In CAN-SPAM, "intentionally to pay" or "intentionally to induce" must be understood by the associate words to "to initiate such a message on one's behalf."

The Defendant's construction argument is actually best demonstrated by Plaintiff in its Response. Plaintiff argues, "What is required under this standard is that IMG did not act accidentally in inducing violative email." Response at 24:8-9. This one sentence reveals the incurable flaw of Plaintiff's position. If the law requires that payment or inducement to send the e-mail was not accidental, the only converse reading of the Plaintiff's proposition is that the law requires that payment or inducement to send the e-mail to be **intentional.** At least on this much, Plaintiff and

---

[2] This is false logic. Using Plaintiff's logic, the following example would necessarily also have to be true: all axe-murderers buy their axes at Quicky-Mart; the defendant bought an axe at Quicky-Mart; therefore, the defendant is an axe-murderer. This is, of course, absurd.

[3] Obviously if alternate payment is a sham the Court can impose liability, for if alternate payment is a sham the payment would, in fact, be for the initiation of the e-mail. Such facts are nowhere close to being present in this case.

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 4

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

Defendant agree - payment or inducement to send e-mails cannot be accidental. Plaintiff simply fails to appreciate that if payment to send an e-mail is not accidental, it must therefore be intentional, which is precisely what was "intended" by Congress.

Although there are no direct cases on point construing this provision of CAN-SPAM, the Ninth Circuit has given this Court very concise guidance in the construction of this provision. In *Hart v. McLucas*, 535 F.2d 516 (9th Cir. 1976), the FAA argued that 14 C.F.R. § 61.59(a)(2) creates strict liability wherein it provides,

> "No person may make or cause to be made … Any fraudulent or intentionally false entry in any logbook, record, or report that is required to be kept, made, or used, to show compliance with any requirement for the issuance, or exercise of the privileges, of any certificate or rating under this part. . . ."

The Ninth Circuit unambiguously rejected the FAA's argument that there was no knowledge requirement to this provision, opining,

> The obvious problem with this interpretation is that it effectively construes the term "intentionally" out of the regulation. The use of the word "intentionally," however, must be assumed to impart a *mens rea* requirement to the regulation. Were this not so, the draftsman of § 61.59(a)(2) could have defined the offense as the making of a false statement without any reference to the mental state of the person who makes the entry. Since, however, § 61.59(a)(2) explicitly includes an intent requirement, it is inconsistent to read the regulation as establishing strict liability. *Hart*, 535 F.2d at 519-20.

Ironically enough, in dealing with the CAN-SPAM definition of "procure," this Court is dealing with the same issue and the same word – "intentionally." Like the FAA, this Plaintiff is also urging the Court to adopt a strict liability standard, even in the face of the fact that the word "intentionally" appears very plainly in the statute. However, the Ninth Circuit Court of Appeals in the Hart case has already patently disapproved this unsound construction. Following this guidance, this Court must logically conclude that the Congressional application of the word "'intentionally' must be assumed to impart a *mens rea* requirement to the [statute]." Therefore, as CAN-SPAM "explicitly includes an intent requirement, it is inconsistent to read the [statute] as establishing strict liability." (Paraphrased references to *id.*)

The statute must be construed in the plain context of all of the words in the statute as they grammatically relate to one another to communicate and articulate the intent of Congress. The

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 5

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

Ninth Circuit more eloquently and succinctly stated the proposition as "a word is known by the company it keeps,' (*noscitur a sociis*)." *Hart*, 535 F.2d at 521. Unfortunately for Plaintiff, the words in the definition of "procure" keep inseparable company with the word "intentionally" and "to initiate such a message on one's behalf." Therefore, this Court must view the statute as its plain language intends; *i.e.*, to intentionally provide compensation to another or intentionally induce another to send the commercial e-mail.

Plaintiff also asserts, albeit patently erroneously, that the legislative history of CAN-SPAM indicates congressional intent to make the punitive civil provisions strict liability. Response at 9:24 – 12:17. Review of the legislative history clearly shows that this argument falls flat on its face. Sen. Frist unambiguously noted, "we can craft a law that will punish individuals who flood our homes with indecent, unsolicited, and endless streams of spam." *149 Cong. Rec. S 9622*. This is not a declaration of strict liability, but a clear declaration of intent to lay the penalties for violating the act precisely at the door of those who do the violating.[4]

Likewise, in introducing CAN-SPAM, Sen. Burns stated, "[t]he CAN-SPAM bill would require e-mail marketers to comply with a straightforward set of workable, common-sense rules designed to give consumers more control over spam**.**" *149 Cong. Rec. S 5204*. This is particularly important as it indicates that the parties involved in commercial e-mailing are given common sense guidelines with which they may or may not comply. This is not a declaration of strict liability, for under strict liability, an innocent Defendant can be held liable for the actions of another without regard to the innocent Defendant's compliance.[5]

---

[4] If Defendant intended, paid or induced a third party to violate the Act on its behalf, then it would be clearly an individual that floods homes with "indecent, unsolicited, and endless streams of spam," and precisely the target of Sen. Frist's outrage. That is precisely why the Act includes those who procure others to do their "dirty work" in the definition of an initiator. However, in the absence of such knowledge or intent, and in this case, in the face of the Defendant's efforts to prevent illegal spamming by third parties, one cannot rationally suggest that Sen. Frist's declaration of focus would include innocent and unknowing parties, for the focus of his statement was "punishment." Punishment deals with a redress for a specific wrong, not the imposition of liability without regard to a specific wrong.

[5] Likewise, the Bill's co-sponsor, Sen. Wyden, stated: "particularly high penalties would be available for true "bad actors"--the shady, high-volume spammers who have no intention of behaving in a lawful and responsible manner." *149 Cong. Rec. S 5208*. Again, this statement indicates very clearly that the legislators were targeting those who intentionally violate the law rather than imposing strict liability on those who have no idea that third parties are violating the law on their behalves. This recitation is not a suggestion that those who willfully or consciously disregard the fact that spammers are acting on its behalf cannot be held liable under the act. On the contrary, as seen *infra,* such persons

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 6

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

One of the most erroneous constructions in Plaintiff's Response is in its analysis and comparison of sections 5 and 6 of CAN-SPAM. Response at 11:21 – 12:5. Under § 6, payment or inducement to a third party spammer is irrelevant. If a company is aware that third party spammers are promoting its products unlawfully, or should objectively know under the circumstances, and does nothing about the problem, the company is liable for the actions of the spammers without regard to whether the company paid, compensated or induced them to act. Perhaps Plaintiff could have sued under this section rather than § 5 (15 U.S.C. § 7704), but it did not.[6] However, Plaintiff's simple failure to do so does not provide a basis for this Court to construe the provisions of § 5 in the manner that is intended for § 6 (which, incidentally, also does not impose strict liability). Section 6 is applicable to persons who do not necessarily pay or induce third parties to send e-mail, but passively benefit from such third party e-mails when they were aware of them or should have been aware of them.

On the contrary, § 5 relates exclusively to those persons who intentionally pay or induce third parties **to send e-mails** on their behalves. This is a critical distinction. As noted by Sen. Burns, "what is different about section 6 … is that section 6 does not require any showing that the merchant actually hired or induced the spammer to send the spam." *149 Cong. Rec. S 15945*. Since sections 5 & 6 are different, and what is different about them is that "§ 6 does not require any showing that the merchant actually hired or induced the spammer to send the spam," then it logically follows that § 5 *does* require a showing that the merchant **actually hired or induced the spammer to send the spam.** It is beyond understanding how Plaintiff fails to appreciate that both the legislative history and the plain statutory language of § 5 clearly predicate liability on payment by a principal to a third party **to send an e-mail.**

---

can be held liable and such is consistent with the Senate's overriding interest in curbing the "true bad actors" as Senator Wyden called them.

[6] Liability may arise under section 6 if a merchant knows or should know that the spamming is occurring, does nothing to attempt to stop it, but instead accepts the benefits from the illegal activity. The facts in this case do not support this contention. The likely reason that Plaintiff did not sue under section 6 is because the overwhelming evidence shows that Defendant made every effort to prevent spamming and terminated those that Defendant discovered had. Plaintiff's only hope of success in this case is to convince the Court to adopt a strict liability construction.

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 7

**CARPELAW** PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

However, the Plaintiff's real problem with the proper construction of the statute is that, under the facts of this case, a proper construction dictates summary judgment in favor of Defendant because Defendant never paid third parties to send e-mails, nor did the Defendant ever induce third parties to send e-mails. Consequently, the case must terminate at the summary judgment stage in favor of the Defendant.

### "Knowledge" Compared to "Intent"

The Defendant has not argued that the 15 U.S.C. § 7704 *et seq.* requires any form of *knowledge*, for, as discussed *supra.*, that is not a permissible interpretation of the statute. Civil liability under the Act only requires that an individual or entity **intentionally** pay or **intentionally** induce another to send email on its behalf.

The Defendant agrees with the Plaintiff that there is *absolutely no requirement* in § 7704 that a defendant possess *knowledge* that a CAN-SPAM violation will occur as a result of this intentional inducement. The statute makes this very clear – "The term "initiate", when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message" and "The term "procure", when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf." 15 U.S.C. § 7702(9), (12).

Liability for CAN-SPAM violations lies with anyone that procures another to *send commercial e-mail* on his behalf. The intentional payment or intentional inducement of another person to initiate *any e-mail*, regardless of said e-mail's conformity with the strictures of the CAN-SPAM act, is the touchstone. "Did IMG intentionally induce *anyone* to send e-mail on it's behalf?" is the issue in this case. Knowledge that a CAN-SPAM violation would result is *irrelevant* to this question. Entities that use others to send commercial email on their behalves are the target of this statute. Entities that say to third parties, "promote my business by using commercial electronic mail messages" are the object of civil liability under the CAN-SPAM statute. Entities, such as IMG, that merely say to third parties, "promote my business" are not.

The Plaintiff has argued that, because the knowledge requirement exists for criminal

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 8

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

culpability to attach under 15 U.S.C. §7704(d)(5), the scienter requirement for civil liability must be lower. Response at 13:2-6. In making this argument, the Plaintiff totally misreads the entire statute as well as the Defendant's argument. The proposition that "'purpose' corresponds to the concept of specific intent, while 'knowledge' corresponds to general intent," as cited by the Plaintiff from *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000), Response at 13:20, is also irrelevant. Apparently, Plaintiff attempts to inject the "knowledge" standard for liability under § 6 (15 U.S.C § 7705 – not claimed in the Complaint) in lieu of the scienter standard imposed for liability under § 7704 (claimed in Plaintiff's Complaint). Aside from the fact that Plaintiff's purported "authority" is a quotation from a court interpreting a statute with "purpose" as the *mens rea* element, this statement fails to support the Plaintiff's assertion that the Defendant's reading of the statute would impute a higher scienter element for civil liability than for criminal liability. The Defendant does not in any way believe that this is what Congress intended, or that it somehow made a "mistake." In fact, the Defendant's reasoning is in harmony with the argument the Plaintiff is propounding – that Congress would *not* have intended such absurd results.

      As discussed *supra*, Congress intended to hold those that use commercial e-mail as a promotional tool accountable for CAN-SPAM violations in the e-mail that they send. Similarly, Congress intended to hold those that procure *others* to send commercial e-mail as a promotional tool accountable for the CAN-SPAM violations in the e-mail sent by those others. The criminal penalty under 15 U.S.C. §7704(d)(5) imposed on "whoever *knowingly* violates paragraph (1)," reflects Congress' intent to hold criminally culpable those that send e-mail *knowing* that said e-mail violates CAN-SPAM, and those that procure others to send e-mail *knowing* that CAN-SPAM will be violated.

      The Defendant does not, therefore, "conflate the concepts of 'general intent' and 'specific intent'" as the Plaintiff has suggested. Response at 13:15-17. The Act holds *civilly* liable those with the "general intent" to procure others to send commercial e-mail and the commercial e-mail sent by others violates 15 U.S.C. §7704(d)(1). The Act holds *criminally* liable those with the "general intent" to procure commercial e-mail and the "specific intent" to violate 15 U.S.C. §7704(d)(1).

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 9

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

This is the plain language of the statute, notwithstanding Plaintiff's desire for it to be construed otherwise.

## The Summary Judgment Standard

In its initial Motion for Summary Judgment, the Defendant demonstrated that there is no dispute of material fact and that it is entitled to judgment as a matter of law.  There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." By demonstrating no dispute of fact, the Defendant has shifted the burden to the Plaintiff.  As this Court recently noted,

> [i]f the movant satisfies his initial burden, the non-movant must come forward with "specific facts showing that there is a genuine issue for trial...."  "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence...."  The non-movant "is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Phillips v. United States*, 2006 U.S. Dist. LEXIS 54395 at 5-6 (2006).

Under CAN-SPAM, payment or inducement **to send a commercial message** is an element of the offense of a violation of 15 U.S.C § 7704 under the "procure" clause.  It is an element of which Plaintiff bears the burden of proof at trial.  Yet, the plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The Court should scrutinize what Plaintiff has presented in opposition to the Defendant's motion, and whether the allegations of the Plaintiff's argument are actually borne out by the supporting affidavits, pleadings, and materials otherwise admissible.  Although there is a significant quantity of material in this case, by going through it, one can only reach the inevitable conclusion

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 10

CARPELAW PLLC
2400 NW 80th Street  #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

1   that Plaintiff has failed to come forward with even a *scintilla* of admissible evidence in support of

2   the proposition that the Defendant intentionally induced the sending of e-mails by third parties.

3   Thus, Plaintiff's offerings fail to support an essential element of its case.

4       Plaintiff has stated that "[s]everal of the affiliates who sent the violative emails at issue in

5   this case were paid large sums of money for their work promoting IMG's adult websites." Response

6   at 5:12-13. Even if true, this is not the same thing as saying the Defendant paid or compensated

7   these people to send those violative e-mails. The facts of the case indicate something quite different.

8   Plaintiff admits that,

> IMG has two payment plans for affiliates, "per sign-up" and "revenue share." Affiliates on the per sign-up payment plan are paid more per sale, with payments increasing with the number of sales they refer to IMG's websites. Affiliates on the revenue share program receive eighty percent of the gross receipts from the accounts they refer, less processing fees.

13  Response at 5:3 (Citing Plaintiff's Motion for Summary Judgment at 7:4-8). It is crucial that

14  the Court understands how Defendant's business works with affiliates. Plaintiff readily

15  acknowledges that Defendant does not pay its affiliates in the traditional sense of paying a set rate

16  for a set act of advertising. The affiliates are paid on the sole result of a person signing up with one

17  of Defendant's Web sites. The affiliates own their own businesses and in many cases their own

18  Web sites. The Defendant has no control over the affiliates other than by its contractual

19  relationships with them through the affiliate program. This is important because no affiliate ever

20  received a dime from Defendant for the act of sending e-mails. It simply never happened. The only

21  compensation that was ever tendered to an affiliate was when a customer referred to Defendant by

22  an affiliate actually subscribed to Defendant's services. It was for this "sign up" that the affiliate

23  was paid. The "channeling" of clients to Defendant is done in a wide variety of ways, of which

24  e-mail was an insignificant portion and not a commercially efficient approach. Moreover,

25  Defendant unequivocally prohibited affiliates from promoting its sites through the use of unsolicited

26  e-mail. Sign ups due to e-mail are not anticipated when the affiliate relationship arises. The fact

27  that IMG generally refers to its affiliates as "Web masters" is telling as to the anticipated mode of

28  promotion.

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 11

**CARPELAW** PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

1   If affiliates took it upon themselves to send e-mails to drive people to Defendant's Web sites, it
2   was not done with Defendant's knowledge, approval or complicity.  Payment was never rendered for
3   such an act.  Indeed, as described *infra,* payment could be and was withheld for such an act.  There is
4   not one shred of evidence in the file that any person signed up to Defendant's sites as a result of an e-
5   mail.  Therefore, there is no proof that payment was ever made to a spammer.  Even if payment were
6   made, under the circumstances, Defendant would not have been paying for the illegal e-mail,
7   Defendant would not have even known that the customer signed up as a result of the e-mail, nor would
8   Defendant have ever known that the spammer had sent the e-mail absent information provided after
9   the fact.  It may have, *arguendo,* compensated the affiliate for the sign up, but it never **intentionally**
10  paid or **intentionally** induced an affiliate to **send an e-mail.**

11  This is a critical concept in this case.  As demonstrated *infra,* Defendant, though having no
12  direct control over affiliates' actions, *did* take steps to prevent affiliates from using e-mail for
13  marketing.  Plaintiff suggests that Defendant was ineffective at this [Response at 7:3-8], but the facts
14  show differently.  If payment was made to an affiliate who sent an e-mail, it was made because a
15  customer signed up and not because Defendant intended, desired or even suffered the e-mail to be
16  sent.  Defendant's policy was not to pay affiliates if IMG determined that they spammed.  Therefore,
17  if IMG made a payment to a person who sent an e-mail, it was not in compensation or payment for the
18  e-mail, but incidental, or as Plaintiff characterizes it, "accidental."

19  Plaintiff states that "[a]fter-the-fact payment to the affiliate by a company is a telling, but not a
20  necessary component of liability."  Response at 5:24-25.  Plaintiff misapprehends the issue at bar.
21  Payment or other compensation before, during, or after the fact is relevant *if and only if* the *quid pro*
22  *quo* for the payment or other compensation is the sending of e-mail.

23  The Plaintiff also suggests several facts in support of its proposition that Defendant induced
24  third parties to send e-mails.  The term "induce" is not defined by the Act.  Therefore, it must be given
25  its plain language meaning.  See *Roles v. Maddox*, 439 F.3d 1016 (9th Cir., 2006) *supra.*  The Oxford
26  Encyclopedic English Dictionary defines the term "induce" as "(often foll. by to + infin.) prevail on
27  [or] persuade."  The only competent facts of this case are that Defendant prohibited others from
28  sending e-mails altogether.  One cannot both prohibit behavior *and* induce it at the same time.

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 12

C ARPE L AW $^{PLLC}$
2400 NW 80th Street  #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

Plaintiff grudgingly admits, "IMG does have a provision in its Program Agreement that on paper restricts affiliates from sending commercial email in violation of CAN-SPAM and the Rule." Response at 7:3-4. Defendant's term is not simply a "paper tiger." Rather, it is a clear, binding and legally operative agreement on both sides. The agreement clearly grants affiliates "A limited nonexclusive, nontransferable and revocable license to access and download promotional banners, and other promotional materials created by ADMINISTRATOR for use on Your **Website** for the exclusive purpose of advertising, marketing or promoting the SoulCash Websites." SoulCash Program Agreement ("Program Agreement"), ¶ 1.2, attached as Exhibit C to the Declaration of Seth Schermerhorn in Support of Defendant's Motion for Summary Judgment ("Schermerhorn Decl.") (emphasis added). Further, the terms of affiliation state that affiliates

> will not use any form of mass unsolicited electronic mail solicitations, news group postings, IRC posting or any other form of "spamming" as a means of promoting Your Website or for the purpose of directing or referring users to any SoulCash Websites. You further acknowledge and agree that We have the right to immediately, and without notice, terminate your participation in the Program if we, in our sole and exclusive judgement, conclude that you have engaged in the use of any form of mass unsolicited electronic mail solicitations, news group postings, password selling or trading, warez, IRC posting or any other form of "spamming". NOTE: WE HAVE ZERO TOLERANCE FOR SPAMMING. IF YOU SPAM, YOUR PARTICIPATION IN THE PROGRAM WILL BE TERMINATED, YOU WILL BE BARRED FROM FUTURE PARTICIPATION IN THE PROGRAM AND ALL FUNDS OTHERWISE DUE TO YOU WILL BE FORFEITED TO THE COMPANY.

Program Agreement, ¶ 2.3. The Defendant's policy had teeth to it and was not simply on paper. The Defendant has terminated twelve affiliates for sending e-mail in violation if the Program Agreement. Schermerhorn Decl. ¶ 10. The only thing that the evidence shows is that Defendant prohibited the use of e-mail to promote IMG's Web sites, and not just on paper.

Plaintiff recites a litany of items that Defendant provided to "induce[] affiliates to send violative messages" *e.g.*, "IMG provided affiliates with marketing materials and support." How providing materials to affiliates to promote IMG's Web sites can be construed as inducing another person **to send an e-mail** departs from the metaphysical and enters into the realm of the mystic. The fact that Defendant provides such materials is no indicia whatsoever that Defendant (1) intended such materials to be used in e-mails, (2) knew that such materials would be used in e-mails, or (3) ever were

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 13

**CARPELAW** PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

used in e-mails. The evidence demonstrates that the materials in question were designed for Web sites, and not e-mails, and Plaintiff has no evidence to support any claim to the contrary. Any two dimensional image may be used in an e-mail, but these materials were not designed or intended for e-mail promotions.

Plaintiff also suggests that "IMG provides assistance to affiliates through a support system that allows affiliates to send questions to IMG and receive responses." Response at 4:5. It is quite a leap from this proposition to conclude that the provision of technical support is the equivalent of inducing a third party to send an e-mail. This is far too much of a leap, particularly in light of the fact that the supporting documentation fails to demonstrate that Defendant's technical support staff was ever used to aid in e-mail campaigns. Similarly, Plaintiff claims that Defendant induced others to send e-mails by providing affiliates with detailed sales statistics. Response at 5:7. Plaintiff disingenuously attempts to spin any incident of any business whereby one is paid a commission for a result to mean that the business induced another to send an e-mail if such person does, in fact, send an e-mail. However, the question of "inducement" hinges around whether IMG persuaded or prevailed upon the person to send the e-mail. It does not hinge on circumstances that, *arguendo*, may be exploited by third parties for their own gain and without the Defendant's knowledge or approval.

Therefore, it is clear beyond doubt that Defendant did not pay others to send e-mails. While revised policies towards affiliate activities may be prudent in light of this litigation to avoid future problems, it does not negate the fact that this Defendant, in this case, did not pay these affiliates to send e-mails. To say that Defendant is liable under the law simply because it paid affiliates who coincidentally sent e-mails, when Defendant did not make payment for that purpose, is tantamount to stating that payment to one's tailor for making a new suit is actionable if the tailor sends out e-mails advocating hiring the client as a model because he looks good in the suit.

Plaintiff claims "IMG induced affiliates to send violative messages." Response at 4:15. The facts of the case demonstrate only that IMG induced its affiliates by promising to pay them for **lawfully** bringing sales to IMG's websites and providing a support system for the affiliates to make those **lawful** sales happen.

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 14

**CARPELAW** PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

**Conclusion**

At this stage, this case hinges on two things, construction and procedure. It is abundantly clear that Plaintiff's "vicarious strict liability" argument is fatally flawed. As the Plaintiff has the burden under the properly construed statute of demonstrating that the Defendant intentionally paid affiliates to send e-mails or intentionally induced others to send e-mails, meaning that Defendant prevailed on or persuaded them to do so, the Court must look to see whether Plaintiff has supported this element with evidence which is more than metaphysical. Plaintiff has not. Plaintiff's arguments are filled with propositions that Defendant supplied marketing materials that **could** be used in e-mails without proof that they **were intended to be**. The same materials **could** be used on billboards or the sides of municipal buses. Plaintiff claims that Defendant had a support system to help affiliates, but fails to show any nexus between the sales staff and the actions of the statute-violating affiliates in the face of the black and white corporate policy of Defendant prohibiting spamming by its affiliates. Plaintiff admits that Defendant pays affiliates not for their individual acts of marketing, but per sign-up. However, Plaintiff fails to produce one person who was paid by Defendant to send an e-mail. The Plaintiff has failed to discharge its burden under Fed. R. Civ. P. 56. As such, Defendant is entitled to summary judgment as a matter of law.

Respectfully submitted this 29th day of September 2006.

CarpeLaw PLLC

*s/ Robert S. Apgood*
WSBA # 31023
CarpeLaw PLLC
2400 NW 80th Street #130
Seattle, WA 98117-4449
Telephone: (206) 624-2379
Facsimile: (206) 784-6305
E-mail: rob@carpelaw.com

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 15

**CARPELAW** PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)

# CERTIFICATE OF SERVICE

I, Robert S. Apgood, do hereby certify that on the 29th day of September 2006, I caused true and correct copies of the following:

1. Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment; and

2. this Certificate of Service.

to be served on:

Lauren Hash, Esq.
Department of Justice
Office of Consumer Litigation
P.O. Box 386
Washington, D.C. 20044

Jeffrey E. Steger, Esq.
Department of Justice
Office of Consumer Litigation
P.O. Box 386
Washington, D.C. 20044

by the filing a copy of same with the Clerk of the Court. In accordance with the Local Rule and the attorneys' agreements, the above named attorneys will receive notification of filing and copies of same using the court's CM-ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Seattle, Washington,

DATED this 29th day of September 2006.

CARPELAW PLLC

*s/ Robert S. Apgood*
WSBA # 31023
CARPELAW PLLC
2400 NW 80th Street #130
Seattle, WA 98117-4449
Telephone: (206) 624-2379
Facsimile: (206) 784-6305
E-mail: rob@carpelaw.com

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 16

CARPELAW PLLC
2400 NW 80th Street #130
Seattle, Washington 98117
(206) 624-2379 - (206) 784-6305 (fax)