UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>IMPULSE MEDIA GROUP, INC.,<br><br>　　　　Defendant. | CV05-1285RSL<br><br>ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on cross-motions for summary judgment (Dkt. #17) (Dkt. #23) regarding defendant Impulse Media Group, Inc.'s liability under the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 15 U.S.C. § 7701 *et seq.* ("CAN-SPAM" or "the Act"), and the Federal Trade Commission's Adult Labeling Rule, 16 C.F.R. § 316 (the "Adult Labeling Rule"). For the reasons set forth below, the Court denies both parties' motions for summary judgment.

## II. FACTUAL BACKGROUND

Defendant owns and operates dozens of commercial websites that feature sexually oriented videos and pictures. To fully access these websites, customers must subscribe and agree to pay a membership fee. In order to attract subscribers, defendant operates an affiliate program it has labeled "SoulCash." Under the SoulCash program, affiliates earn money every

ORDER DENYING MOTIONS
FOR SUMMARY JUDGMENT -1

time they refer a customer who ultimately subscribes to one of defendant's websites. To participate in the SoulCash program, affiliates must provide a valid e-mail address and agree to the SoulCash Program Agreement (the "Program Agreement"). See Declaration of Seth Schermerhorn (Dkt. #24) ("Schermerhorn Decl."), Ex. C.

Section 2.3 of the Program Agreement prohibits affiliates from using "any form of mass unsolicited electronic mail solicitations, news group postings, IRC posting or any other form of 'spamming' as a means of promoting Your Website for the purpose of directing or referring users to any SoulCash Websites." Schermerhorn Decl., Ex. C. Section 2.3 also reserves defendant's right to terminate an affiliate for using such techniques, and concludes with the following statement:

> NOTE: WE HAVE ZERO TOLERANCE FOR SPAMMING. IF YOU SPAM, YOUR PARTICIPATION IN THE PROGRAM WILL BE TERMINATED, YOU WILL BE BARRED FROM FUTURE PARTICIPATION IN THE PROGRAM AND ALL FUNDS OTHERWISE DUE WILL BE FORFEITED TO THE COMPANY.

Once an affiliate has signed up for the SoulCash program, defendant provides it with marketing and promotional tools for use in its affiliates' referral efforts. These tools include hosted and downloadable photo galleries, banners, pictures of the day, movies of the day, and other online media content. Most of the graphics provided to affiliates are embedded with hyperlinks which direct potential subscribers to defendant's websites. In addition, defendant provides affiliates with technical support. To track which affiliate is responsible for a particular referral, each affiliate is assigned a unique user ID. Affiliates, in turn, are provided with detailed sales statistics which include the number of sales, number of clicks, referring URL information, and a list of the total dollar amount earned by the affiliate. Affiliates have the choice to be paid a set amount for each customer who subscribes to defendant's service or for 50 percent of the payments made by a referred subscriber. Defendant also periodically makes bonus payments to affiliates to encourage additional referrals.

As part of its efforts to combat spam, Microsoft Corporation created a number of Hotmail

e-mail accounts it calls "trap accounts." These accounts are used by Microsoft to detect spam being sent to Hotmail users in violation of Microsoft's Terms of Use and Anti-Spam Policy. In response to requests from the Federal Trade Commission in or about November 2004, February 2005, and April 2006, Microsoft provided the government with hundreds of e-mail messages containing sexually explicit materials that were sent to Microsoft trap accounts by defendant's affiliates.

### III. DISCUSSION

**A. Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The evidence is viewed in the light most favorable to the non-moving party. Id. "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor," Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995), or where there is a "complete failure of proof concerning an essential element of the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Trinton Energy Corp., 68 F.3d at 1221.

**B. Defendant's Liability Under CAN-SPAM and the Adult Labeling Rule**

Plaintiff alleges that the e-mails sent by defendant's affiliates violate a number of labeling requirements imposed by CAN-SPAM and the Adult Labeling Rule. Specifically, plaintiff maintains that these e-mails violated 15 U.S.C. § 7704(d) and 16 C.F.R. § 316.4(a) because they contain sexually oriented material and: (1) did not include the required "SEXUALLY-

EXPLICIT:" label at the beginning of the subject line; (2) included sexually explicit material in the initially viewable portion of the message; (3) did not include another "SEXUALLY-EXPLICIT:" label in the message itself; (4) did not include a notice of the right to opt-out of receiving further e-mail; (5) did not include a clear and conspicuous display of a valid physical postal address of the defendant. Plaintiff also alleges that the same e-mails violated 15 U.S.C. § 7704(a)(5)(A)(ii)-(iii) and 16 C.F.R. § 316.4(a) which applies to all commercial e-mails, whether or not they contain sexually oriented material, by failing to include both clear and conspicuous notice of the opportunity to decline to receive further commercial e-mail messages and a valid physical postal address for defendant.

Under CAN-SPAM, liability for injunctive relief falls on those who "initiate" the transmission of a commercial e-mail message to a protected computer[1] which violates the above requirements. As used in the Act, "initiate" means "to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message." 15 U.S.C. § 7702(9). Plaintiff does not allege that defendant itself originated or transmitted the e-mail in question, but instead argues that defendant procured the transmission of improper e-mails. Under the Act, parties procure the transmission of an e-mail message when they "intentionally . . . pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf." 15 U.S.C. §7702(12).

Focusing on the word "intentionally" in the definition of "procure" contained in the Act, defendant maintains that to be liable under CAN-SPAM, it must have intended that its payments to, or inducement of, affiliates would result in the sending of commercial e-mail. Defendant argues that it cannot be liable under the Act, because plaintiff has put forward no evidence that it had such an intent.

---

[1] "Protected computer" includes all computers used in interstate commerce or communications. See 15 U.S.C. § 7702(13), referencing 18 U.S.C. § 1030(e)(2)(B).

ORDER DENYING MOTIONS
FOR SUMMARY JUDGMENT -4

Plaintiff responds that defendant is liable for injunctive relief because Congress explicitly chose to impose liability in such situations regardless of a defendant's "knowledge" of the violations. In support of this contention, plaintiff points to language in a July 16, 2003 Senate version of the Act that would have imposed such a knowledge requirement on offenders:

> The term "procure," when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf, *knowing, or consciously avoiding knowing, the extent to which that person intends to comply with the requirements of the Act.*

S. 877 Sec. 3(13) (July 16, 2003) (emphasis added). This "knowledge" requirement was later dropped from the definition of "procure" contained in the final version of the bill. See 15 U.S.C. § 7702(12).[2] Plaintiff also points to the fact that the Act's criminal provision requires that a defendant "knowingly" procure commercial e-mail that fails to place warning labels on sexually oriented material. 15 U.S.C. § 7704(d)(5). It argues that to insert an additional "knowledge" requirement into the Act's injunctive provisions would make the "knowledge" requirement contained in the criminal provision "mere surplusage." Plaintiff's Motion at 26. As a result, plaintiff maintains that it need only "prove that IMG induced affiliates to send email that were in violation of the law." Plaintiff's Reply at p. 9.

The Court agrees with plaintiff that it need not show that defendant was aware of its affiliates' violations of CAN-SPAM to obtain injunctive relief. A party can subject itself to injunctive relief whenever it intentionally pays for, or induces, a third-party to send any commercial e-mail message. Once a party intentionally pays for, or induces, a commercial e-mail to be sent, it cannot escape liability for injunctive relief simply because it was unaware that CAN-SPAM provisions were being violated by the party sending the e-mails. In that sense, plaintiff is correct in its statement that CAN-SPAM's injunctive relief provisions contain "no exception for renegade behavior." Plaintiff's Motion at p. 25.

---

[2] A similar definition of "procure" was included in the Act's provision that provides authorization for a private right of action for Internet Service Providers. 15 U.S.C. § 7706(g)(2).

ORDER DENYING MOTIONS
FOR SUMMARY JUDGMENT -5

However, given the inclusion and context of the word "intentionally" in the Act's definition of "procure" the Court cannot conclude that CAN-SPAM triggers liability without a threshold showing that the defendant intended to pay or induce another to send commercial e-mail.  While the scope of CAN-SPAM is broad, especially with regard to injunctive relief, its reach is not endless.  See Omega World Travel v. Mummagraphics, Inc., 469 F.3d 348, 350 (4th Cir. 2006) ("The CAN-SPAM Act addresses 'spam' as a serious and pervasive problem, but it does not impose liability at the mere drop of a hat.").  The Court rejects plaintiff's effort to characterize the CAN-SPAM Act as a strict liability statute that would ensnare anyone who may have induced another party to send violative e-mails, regardless of whether they intended the party to send commercial e-mails in the first place.[3]  This interpretation of the Act would render the word "intentionally" in the Act's definition of "procure" meaningless.  See Hart v. McLucas, 535 F.2d 516, 519 (9th Cir. 1976) (a statute that explicitly includes an intent requirement cannot be read to establish strict liability).  Rather, the plain language of the Act requires that plaintiff prove that defendant intentionally paid or induced another party to undertake the specific act of sending a commercial e-mail.  Plaintiff acknowledges this to some extent when it admits that defendant would be shielded from liability if it "accidentally procured the sending of violative spam" because "the inducing would have been accidental rather than intentional."  Plaintiff's Response at p. 14.

The Court also cannot accept plaintiff's contention that giving meaning to the word "intentionally" in the Act's definition of "procure" is in conflict with the knowledge requirement contained in other portions of the Act.  The intent and knowledge requirements focus on two related, but distinct, sets of facts.  The intent element requires that a defendant actually intend to procure commercial e-mail when it solicits another party for services.  The knowledge element

---

[3] Plaintiff argues that caselaw interpreting the Migratory Bird Treaty Act, 16 U.S.C. § 703 and the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 331(k) supports its contention that CAN-SPAM should also not be read to include an "intent" element.  Plaintiff's Response at pp. 10-11.  Unlike CAN-SPAM, neither statute includes the word "intentionally" in the relevant portion of its text.

1  deals with a defendant's awareness of whether the party it intentionally paid or induced to send
2  commercial e-mails was complying with the requirements of CAN-SPAM.  Thus, under the
3  Act's structure, a party who intentionally induces another to send commercial e-mails, but who
4  is unaware that the other party is violating the Act's provisions could be subject to injunctive
5  relief, but not to criminal penalties.  In that instance, the party would have intentionally induced
6  another to send commercial e-mails, but would not have "knowingly" procured e-mails that
7  violated the terms of the Act.  This interpretation is in accordance with what both parties agree
8  was Congress' intent to stem the tide of unwanted and misleading spam e-mails and to impose
9  liability on not just the "button pushers" but also on those who may attempt to avoid
10 responsibility by intentionally paying or inducing others to be the "button pushers."[4]  See
11 Plaintiff's Response at pp. 10-11; Defendant's Response at p. 10.

12        Having established that plaintiff must demonstrate that defendant intentionally induced its
13 affiliates to send commercial e-mails, the question becomes whether there are disputed issues of
14 material fact related to the allegation that defendant intentionally induced commercial e-mails in
15 this case.  The Ninth Circuit has defined "induce" as "to move by persuasion or influence."
16 United States v. Rashkovski, 301 F.3d 1133, 1136-37 (9th Cir. 2002).  Defendant acknowledges
17 that it intended to induce affiliates to refer customers to its websites, but argues that it intended
18 for affiliates to generate these referrals through its affiliates' own websites, not through the use
19 of commercial e-mail.  The Court concludes that there are disputed questions of material fact on
20 the question of defendant's intent.  See Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999)
21 (questions of intent should typically be resolved by a jury).  Both parties' motions for summary

---

[4] The Court is not persuaded by the legislative history cited by plaintiff.  Plaintiff's Response at p. 12.  As plaintiff admits, the exchange cited merely confirms that Congress intended that multiple parties could be liable for the same violative e-mail.  The Court does not disagree with that contention.  The exchange does not shed light on the question of whether a party can be liable under the Act for inducing another to send commercial e-mail if plaintiff has not shown that such inducement was intentional.

ORDER DENYING MOTIONS
FOR SUMMARY JUDGMENT -7

judgment are therefore denied.[5]

Plaintiff has put forward evidence to support its theory that defendant intentionally paid its affiliates with the understanding that these affiliates may generate referrals through the use of e-mail.  Despite the fact that defendant operated in an industry where illegal spam was prevalent, the evidence indicates that defendant made minimal efforts to screen potential affiliates or to track and punish those affiliates who were violating its e-mail policy.[6]  Even when defendant did take efforts to terminate an affiliate for improperly sending spam, it appears that they did not always terminate all of that affiliate's accounts.  When combined with evidence indicating that defendant willingly provided its affiliates with marketing materials and technical support that could be used to generate illegal spam, a reasonable fact finder could conclude that defendant's contractual prohibition of affiliates' use of e-mail was simply a paper tiger or "sham" intended to provide legal cover for defendant's efforts to induce its affiliates to do precisely the opposite.

That said, defendant has presented evidence that could convince a reasonable fact finder that it did not intend its affiliates to ever use commercial e-mail to drive traffic to its websites. Primary among this evidence is the Program Agreement's explicit prohibition on the use of "any form of mass unsolicited electronic mail solicitations . . . or any other form of 'spamming' as a

---

[5] In a recent case involving similar facts, a district court in Arizona also denied both parties' summary judgment motions after concluding that there were disputed issues of material fact regarding the nature of the relationship between the defendant and its affiliates. United States v. Cyberheat, No. 05-457, 2007 WL 686678 (D. Ariz. Mar. 7, 2007).

[6] Plaintiff argues that defendant was aware that it was operating in an environment conducive to spamming, and that CAN-SPAM therefore requires it to take affirmative steps to monitor or screen its affiliates to ensure that they were not sending violative e-mails. Plaintiff's Response at pp. 6-7.  As discussed above, CAN-SPAM does not impose a strict liability regime on all who may have a connection to improper e-mail.  While certainly some provisions of the Act may impose duties to monitor other parties to ensure that they are complying with CAN-SPAM, no such duties are triggered for those who do not intentionally induce the transmission of commercial e-mails.  While the prevalence of the use of spam in defendant's industry may be relevant to evaluating defendant's arguments regarding its lack of intent to procure such e-mails through its SoulCash program, it is not sufficient to establish plaintiff's liability on summary judgment.

ORDER DENYING MOTIONS
FOR SUMMARY JUDGMENT -8

means of promoting Your Website or for the purpose of directing or referring users to any SoulCash Websites." Affiliates in violation of this provision were subject to having their affiliate status terminated and their referral fees forfeited, and defendant has produced a spreadsheet documenting the termination of twelve affiliates for violating this provision of the contract. Plaintiff's Response at p. 7.

Further, plaintiff has not put forward any direct evidence that defendant ever paid an affiliate for the explicit purpose of sending commercial e-mail or that defendant ever provided its affiliates with marketing or technical support with the knowledge that affiliates were using this support for the production of commercial e-mail. While defendant acknowledges that affiliates were provided with marketing and technical assistance, it maintains that it never intended for such assistance to be used in aid of sending commercial e-mails. Though plaintiff is correct that the marketing materials identified by plaintiff (hosted and downloadable photo galleries, banners, pictures of the day, movies of the day, and interstitials) could be used in e-mails, the same materials could also be used to generate referrals by providing legitimate affiliate websites with content and tools that would drive customer traffic to defendant's websites. The same holds true for defendant's provision of technical support to its affiliates. In fact, the language contained on the SoulCash website featuring these tools repeatedly refers to affiliates as "Webmasters," affiliates' customers as "surfers," and the picture and videos provided to affiliates as "webmaster tools." Schermerhorn Decl., Ex. A. Further, the toll free technical support number provided to affiliates is labeled as "TOLL FREE WEBMASTER SUPPORT" on the bottom of every SoulCash website. Simply because it is technically feasible for these tools to be used by affiliates violating the terms of their contract with defendant does not necessarily mean that defendant intended them to be used in such a manner. The question of defendant's intent should be resolved by the trier of fact.[7]

---

[7] Plaintiff also argues that defendant is liable for civil penalties pursuant to Section 7706(a) of CAN-SPAM. This provision states that the Act "shall be enforced by the [Federal Trade] Commission as

1

## IV. CONCLUSION

For all the foregoing reasons, both parties' motions for summary judgment are DENIED (Dkt. #17) (Dkt. #23).

DATED this 8th day of June, 2007.

*[signature]*

Robert S. Lasnik
United States District Judge

---

if the violation of this chapter were an unfair or deceptive act or practice proscribed under Section 57a(a)(1)(B) of this title." 15 U.S.C. § 7706(a). Such penalties are only available if plaintiff can establish that defendant violated a provision of the CAN-SPAM Act and that it committed the violation "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited." 15 U.S.C. § 45(m)(1)(A). As explained above, there are genuine issues of material fact on the question of defendant's intent to procure e-mail. As such, plaintiff's motion for summary judgment on defendant's liability for civil penalties is also denied.